An appropriate Order will issue.

**UNITED STATES of America**

**v.**

**David L. FOSTER.**

**Case No. 7:11–po–00100.**

United States District Court,
W.D. Virginia,
Roanoke Division.

Nov. 4, 2011.

---

Joseph William Hooge Mott, Duty Assistant, United States Attorneys Office, Roanoke, VA, for Plaintiff.

Thomas Marvin Blaylock, Roanoke, VA, for Defendant.

## MEMORANDUM OPINION

MICHAEL F. URBANSKI, District Judge.

Defendant David L. Foster ("Foster") was charged with speeding on the Blue Ridge Parkway and a violation of 36 C.F.R. § 4.23(a)(1), which prohibits operating or being in actual physical control of a motor vehicle while under the influence of alcohol to a degree that renders the operator incapable of safe operation.[1]    A trial

---

1. Originally, Foster was charged with a violation of 36 C.F.R. § 4.23(a)(2), which makes it illegal to operate or be in actual physical control of a motor vehicle with an alcohol concentration in excess of 0.08 grams of alcohol per 100 milliliters of blood or 210 liters of breath.  The government's motion to amend

was held on April 20, 2011. At trial, Foster moved to dismiss the DUI charge, objecting to the introduction of two government exhibits: (1) Government Exhibit 1 ("Ex. 1"), the Certificate of Instrument Accuracy for the Intox EC/IR II used to perform Foster's breathalyzer test; and (2) Government Exhibit 2 ("Ex. 2"), the Certificate of Blood Alcohol Analysis. At the conclusion of the evidence, the court took the DUI charge under advisement to allow the parties to brief the issue of the admissibility of the two exhibits. Foster was found guilty of speeding, and judgment was entered on this charge on April 21, 2011. *See United States v. Foster*, No. 7:11po099 (W.D.Va. Apr. 21, 2011).

The two issues currently before the court are: (1) whether the government's exhibits concerning the accuracy of the Intox EC/IR II and the results of the breath test administered to Foster are admissible under the Constitution and pursuant to the Federal Rules of Evidence; and (2) whether the evidence establishes beyond a reasonable doubt that Foster was "under the influence of alcohol ... to a degree that render[ed] [him] incapable of safe operation" of his motor vehicle on the night in question. 36 C.F.R. § 4.23(a)(1). Controlling Supreme Court precedent plainly establishes that the evidence introduced by the government does not violate the defendant's rights under the Confrontation Clause. But the government has not laid a proper foundation for the admission of the Certificate of Instrument Accuracy pursuant to the Federal Rules of Evidence. Ex. 1 is therefore not admissible. Nor has the government otherwise established that this particular Intox EC/IR II breathalyzer, which generated the reading on the Certificate of Blood Alcohol Analysis, was properly maintained and operating accurately at the time of the

the charge to 36 C.F.R. § 4.23(a)(1) was

test, as required by 36 C.F.R. § 4.23(c)(4). So while Ex. 2 meets the minimal authentication requirement for admission into evidence, the blood alcohol reading set forth on the Certificate of Blood Alcohol Analysis is given little weight, because the government has failed to establish that the machine was functioning properly on the night in question.

The court has carefully considered the evidence adduced at trial, including Foster's statements and actions on the night in question and his performance on the field sobriety tests. Given the specific facts and circumstances of this case, the court finds the government has not met its burden of proving Foster is guilty of being under the influence of alcohol to a degree that rendered him incapable of safe operation of his vehicle. As such, the court finds Foster **NOT GUILTY** of violating 36 C.F.R. § 4.23(a)(1).

## I.

On the evening of April 3, 2011, Rangers Smith and Lyon stood near the Roanoke River Overlook parking lot on the Blue Ridge Parkway, near milepost 114.9, in the Western District of Virginia. The rangers were monitoring traffic using their handheld LIDAR laser units. At approximately 7:19 p.m., Ranger Lyon saw a dark green pick-up truck heading northbound at what the ranger believed to be a rate of speed faster than the 35 mph posted speed limit. The driver was traveling downhill just past an area where the speed limit changes from 45 mph to 35 mph. Ranger Lyon testified that he did not observe the vehicle swerve or weave in any respect as it traveled towards him. Using his LIDAR unit, Ranger Lyon determined that the vehicle was traveling 50 mph.

granted at trial.

Ranger Lyon stepped out into the middle of the driver's lane of travel and motioned for the driver to stop. Foster, the driver of the vehicle, stopped without difficulty. Ranger Lyon approached the driver's side window and showed Foster the LIDAR unit that had clocked his speed at 50 mph. Ranger Lyon testified that Foster was wearing dark sunglasses[2] at the time. When Foster removed his sunglasses, Ranger Lyon observed that Foster had glassy, watery eyes that appeared to be bloodshot, and noted a strong odor of alcohol. Ranger Lyon also testified he found Foster's speech to be slurred. Ranger Lyon directed Foster to pull over into the Roanoke River Overlook parking lot. When questioned by defense counsel about why he allowed Foster to drive his vehicle into the parking lot when he suspected Foster had been drinking, Ranger Lyon replied, "All I could tell was that he had been consuming alcohol.... I did not know how much."

Foster pulled over approximately 30 to 40 feet into the parking lot and parked in a parking space without difficulty. Ranger Lyon again approached the driver's side window. Foster produced his license and registration without difficulty. Ranger Lyon asked Foster if he had been drinking. Foster replied that he and his passenger had been "pre-gaming" prior to a race at the speedway in Martinsville, Virginia, but Foster claimed that he had had nothing to drink since the race began. Ranger Lyon asked if there were any open containers in the vehicle, and the passenger pointed to a 24-ounce can of beer on the floorboard of the passenger's side. There was no open container on the driver's side of the vehicle. Ranger Lyon motioned for Ranger Smith to come and assist him with the traffic stop. Ranger Smith approached the passenger, and Ranger Lyon asked Foster to step out of the vehicle and perform field sobriety tests.

Foster exited the vehicle without difficulty. Ranger Lyon then administered a series of field sobriety tests, beginning with the horizontal gaze nystagmus test. Ranger Lyon testified that six out of a total of six possible clues were indicated. The test revealed a lack of smooth pursuit in both eyes, nystagmus (rapid eye movement) at maximum deviation in both eyes, and nystagmus prior to 45 degrees in both eyes. Ranger Lyon testified that based on his training and experience, this test confirmed that there was a probability Foster had been consuming alcohol.

Ranger Lyon then administered a walk-and-turn test. Ranger Lyon instructed Foster to take nine steps heel-to-toe along a parking spot line, turn, and take nine steps heel-to-toe back, all while keeping his arms at his side. Ranger Lyon testified that Foster took the appropriate number of steps both out and back, but that he failed to touch his heel to his toe leaving a "gap" on step number 6[3] during the first set, and on steps 2, 5, 7 and 8 during the second set. He also failed to keep his arms at his side. Ranger Lyon testified that while he was giving Foster the instructions, Foster had a difficult time maintaining his balance. Yet Foster did not fall off of the parking spot line, miss a step or otherwise lose his balance during the test. He also properly completed his turn.

Foster next performed the one-leg stand test. Ranger Lyon instructed him to raise the foot of his choice six inches off the

---

2. Ranger Lyon testified that it was still light outside at this point in time.

3. At step 6, Ranger Lyon reminded Foster to count out loud, which Foster did properly for the remainder of the test.

ground, point his toe, keep his hands at his side, and maintain this position for thirty seconds, counting "one, one thousand; two, one thousand." Foster was able to balance in this position without putting his foot down and count out loud as instructed for 37 seconds. However, Ranger Lyon testified that Foster raised his arms over six inches and swayed to maintain balance during the test. Ranger Lyon testified that the purpose of this test is to determine a driver's balance, and on cross-examination, he admitted that of the field sobriety tests, this is the one with which people have the most trouble.

Ranger Lyon placed Foster under arrest and transported him to the Vinton Police Department. Ranger Smith drove a separate vehicle. Foster and the rangers had to wait for someone from the Vinton Police Department to come and open the building for them. Ranger Smith testified that while they were waiting, he noticed Foster "was having a little bit of difficulty standing and he stumbled a little bit." Prior to administering a breath test, Ranger Smith observed Foster during a mandatory twenty minute waiting period. Ranger Smith performed a breath test using the Intox EC/IR II at 9:05pm. The test was administered nearly an hour after Foster was transported to the Vinton Police Department.

Ranger Smith testified that this was the first time he administered a case-related breath test using the Intox EC/IR II. However, he had been trained in its use and in the course of that training had conducted multiple tests and taken numerous samples. Ranger Smith testified that the machine first ran a diagnostic test to ensure there was no detectable alcohol in the air. Foster's breath sample was then taken, and the machine produced a Certificate of Blood Alcohol Analysis indicating Foster's blood alcohol concentration ("BAC") was .12 grams per 210 liters of breath.

At trial, the government introduced as Ex. 1 a Certificate of Instrument Accuracy for the machine used to perform Foster's test, which was signed by Melissa Kennedy, Section Supervisor, Virginia Department of Forensic Science. This document bears no reference to Foster and concerns the accuracy of the breathalyzer itself. Ex. 1 indicates that the specific breathalyzer machine used to perform Foster's test was certified as of March 10, 2011 as meeting "all requirements for accuracy and performance established by the Department of Forensic Science." Ranger Smith testified he has no training or experience with the maintenance of the machine, he does not know Melissa Kennedy, he does not know whether she actually performed the recertification test and whether the machine was properly calibrated at the time, and that he understands from his training that if the machine had not been certified it would produce an error reading.

Ex. 2, the second document tendered by the government, is Foster's alcohol concentration results as calculated by that machine.

At trial, Foster objected to both exhibits, arguing they are hearsay and violate his rights under the Confrontation Clause, citing *Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009). Foster claimed that although Ranger Smith administered the test and was available for questioning, the individual who performed maintenance on the Intox EC/IR II was not present at trial or otherwise made available for questioning. Thus, Foster argued he had no one to cross-examine as regards the accuracy of the machine. The court admitted the evidence subject to Foster's objections. Foster then moved to dismiss the DUI charge,

claiming the government had not proven that he was under the influence of alcohol to a degree that made him incapable of safe operation. 36 C.F.R. § 4.23(a)(1).

## II.

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." U.S. Const. amend. VI. The Supreme Court held in *Crawford v. Washington,* 541 U.S. 36, 53–54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), that the Sixth Amendment Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination."

In *Melendez–Diaz v. Massachusetts,* the Supreme Court addressed the issue of whether a certificate containing the results of forensic analysis is a testimonial statement invoking a defendant's Sixth Amendment right to confrontation. 557 U.S. 305, 129 S.Ct. 2527. During Melendez–Diaz's trial, the prosecution submitted three certificates of analysis, which documented that the substance seized in connection with defendant's arrest contained cocaine. *Id.* at ——, 129 S.Ct. at 2531. Melendez–Diaz objected to the admission of the certificates, asserting *Crawford* required the analysts to testify in person. *Id.* The certificates were admitted over defendant's objection and the jury found Melendez–Diaz guilty. *Id.* On appeal, Melendez–Diaz argued admission of the certificates violated his Sixth Amendment right to confront witnesses testifying against him. *Id.* In a 5–4 decision, the Supreme Court held that

the certificates at issue were essentially affidavits, which fall "within the 'core class of testimonial statements'" described in *Crawford. Melendez–Diaz,* 557 U.S. at ——, 129 S.Ct. at 2532. Thus, "[a]bsent a showing that the analysts were unavailable to testify at trial *and* that petitioner had a prior opportunity to cross-examine them, [Melendez–Diaz] was entitled to 'be confronted with' the analysts at trial." *Id.* (quoting *Crawford,* 541 U.S. at 54, 124 S.Ct. 1354).

In the instant case, Foster objects to the admission of both the Certificate of Instrument Accuracy (Ex. 1) and the Certificate of Blood Alcohol Analysis (Ex. 2). Foster argues these documents are testimonial in nature and the government should have been required to call a witness from the Department of Forensic Science to testify as to the accuracy of the Intox EC/IR II. It is undisputed that Melissa Kennedy, the person who signed the Certificate of Instrument Accuracy, was not available to testify at trial and that Foster had no prior opportunity to cross-examine her, which Foster argues violates his Sixth Amendment rights. On the other hand, Ranger Smith who administered the breath test and signed the Certificate of Blood Alcohol Analysis as "breath test operator" was available to testify at trial and was cross-examined by Foster. But Ranger Smith admitted that he has nothing to do with the testing or maintenance of the Intox EC/IR II.[4] Thus, Foster maintains the Certificate of Blood Alcohol Analysis also is not admissible, because no one was available to testify that the BAC reading set forth on the certificate is an accurate one.

---

**4.** Ranger Smith did recount from his training that if the Intox EC/IR II is not working properly, it will not take a sample. He further explained that if the machine has not been certified by the time a recertification is due, it will produce an error reading, and will not administer a test.

## III.

### A. Certificate of Instrument Accuracy, Ex. 1.

*1. Admissibility pursuant to the Sixth Amendment to the United States Constitution.*

■ Courts in the Eastern District of Virginia have had occasion to consider the admissibility of certificates verifying accuracy of testing equipment and have consistently held that such evidence is non-testimonial in nature and does not violate the Confrontation Clause. *See United States v. Christie,* No. 3:09mj433, 2009 WL 4499124, at *4 (E.D.Va. Dec. 3, 2009) ("Evidence of routine testing for accuracy does not violate the Confrontation Clause."); *United States v. Griffin,* No. 3:09MJ308, 2009 WL 3064757, at *2 (E.D.Va. Sept. 22, 2009) (holding evidence of instrument accuracy "is nontestimonial evidence beyond the scope and reach of the Confrontation Clause."); *United States v. Bacas,* 662 F.Supp.2d 481, 484 (E.D.Va.2009) (certificates verifying the accuracy of tuning forks used to test the accuracy of officers' radar equipment constitute non-testimonial evidence falling outside the confines of the Confrontation Clause); *United States v. Forstell,* 656 F.Supp.2d 578, 580 (E.D.Va. 2009) (holding certificates that verify accuracy of testing devices and equipment "are nontestimonial, and, thus, their admission does not run afoul of the Confrontation Clause."). Indeed, the Supreme Court carved out the category of non-testimonial records from its ruling in *Melendez–Diaz,* noting specifically, "we do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing … accuracy of the testing device, must appear in person as part of the prosecution's case." 557 U.S. at —— n. 1, 129 S.Ct. at 2532 n. 1. The Court further stated that documents such as Ex. 1 that are "prepared in the regular course of equipment maintenance may well qualify as nontestimonial records." *Id.*

Courts distinguish certificates verifying accuracy of testing equipment from certificates offered to establish an element of the offense, like those at issue in *Melendez–Diaz.* For example, in *Griffin,* 2009 WL 3064757, at *1, defendant was charged with driving under the influence and moved to exclude a certificate of instrument accuracy concerning the Intox EC/IR II machine used to conduct the breath test. The court distinguished this type of certificate from the certificates of forensic analysis that were the subject of the Court's opinion in *Melendez–Diaz,* holding, "[i]t is clear … that a Certificate of Accuracy, introduced only to verify the calibration of a testing device used by law enforcement, does not constitute testimony 'against' a defendant in the same way as a certificate of analysis offered to establish an element of an offense." *Id.* at *2. The court noted that unlike the certificates at issue in *Melendez–Diaz,* the Certificate of Accuracy "only conveys information regarding the calibration and proper operation of the Intox EC/IR II …. [and] was not prepared with knowledge of any particular defendant's case, or specifically for use in any particular trial."[5] *Id.* The

---

5. Foster asserts that the Department of Forensic Science faxed him an unsigned and unnotarized version of Ex. 1, the Certificate of Instrument Accuracy, five days prior to trial. Then, seven minutes before trial began, a new version of the certificate—signed and notarized—was faxed. Foster concludes, therefore, that Ex. 1 was notarized in anticipation of litigation, which suggests that it is a testimonial document.

Foster's argument fails for two reasons. First, courts have made clear that this type of certificate of accuracy is non-testimonial in nature. Second, the document marked as Ex. 1 was notarized on March 22, 2011, approximately two weeks before Foster was tested

court in *Bacas* agreed, referring to certificates confirming the proper calibration of tuning forks used to test accuracy of a radar detection unit as "a different type of certificate" than those at issue in *Melendez–Diaz.* 662 F.Supp.2d at 483. The *Bacas* court held that "a certificate of analysis offered to establish an element of an offense, like that in *Melendez–Diaz,* far more readily constitutes testimony 'against' a defendant than does the ilk of routine testing information contained in the United States's proffered exhibits." *Id.* at 484.

Likewise, in *Christie,* 2009 WL 4499124, at *1 n. 2, *3, defendant objected to the admission of the certificate of blood alcohol analysis, which contained an attestation clause stating the equipment used to conduct the test was accurate, claiming it violated the Confrontation Clause and the Supreme Court's decision in *Melendez–Diaz.* Defendant argued that both the operator of the breath machine and the person who tested the machine for accuracy were required to testify at trial, because the certificate "was obviously generated for use against Defendant Christie at trial" and served the same purpose as a witness offering live testimony. *Id.* at *3. The court rejected this argument as contrary to established precedent and held that "the portion of the certificate Christie seeks to challenge falls squarely within the category of nontestimonial records carved out by the Supreme Court in *Melendez–Diaz* and previously recognized by this Court." *Id.* at *4–5; *see also Forstell,* 656 F.Supp.2d at 581 ("Certificates regarding such routine information [as accuracy and maintenance tests] fit squarely into the category of nontestimonial records carved out by the Supreme Court. Thus, the government is not required to make available at

trial the technicians who performed the tests in order for the certificates to be admissible.").

On brief, Foster relies on the Supreme Court's recent decision in *Bullcoming v. New Mexico,* —— U.S. ——, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011), to support his position that the government should have called a witness from the Department of Forensic Science to introduce Ex. 1, the Certificate of Instrument Accuracy. The petitioner in *Bullcoming* was charged with driving while intoxicated. *Id.* at ——, 131 S.Ct. at 2709. At trial, the prosecution sought to introduce a forensic laboratory report certifying that Bullcoming's blood alcohol concentration was above the legal limit. *Id.* The prosecution did not call the analyst who signed the certificate to testify and instead called another analyst who was familiar with testing procedures but had not performed or observed the test on Bullcoming's blood sample. *Id.* The issue before the Supreme Court was whether the Confrontation Clause allowed the prosecution to introduce a testimonial certification through the testimony of an analyst who did not sign the certification or perform or observe the test reported in the certification. Relying on *Melendez–Diaz,* the Supreme Court found that the forensic laboratory report was a testimonial statement that cannot be introduced at trial "unless the witness who made the statement is unavailable and the accused has had a prior opportunity to confront that witness." *Id.* at ——, 131 S.Ct. at 2713.

Foster argues that as in *Bullcoming,* the person who performed testing on the Intox EC/IR II and found it to be accurate was not made available for cross-examination, and thus, admission of Ex. 1 violates his Sixth Amendment rights. In so arguing, Foster blurs the line between

using the Intox EC/IR II on April 3, 2011. As such, it cannot be argued credibly that it was

created for evidentiary purposes in Foster's case.

a certificate of accuracy and a certificate of analysis. *Bullcoming*, like *Melendez–Diaz*, involved a testimonial certification—a forensic laboratory report. Ex. 1, on the other hand, is a Certificate of Instrument Accuracy. Courts have distinguished certificates verifying accuracy of testing equipment from certificates of analysis offered to establish an element of the offense. See discussion, *supra*. The latter have been held to be testimonial statements subject to the Sixth Amendment's Confrontation Clause; the former have not. Indeed, Justice Sotomayor reiterated in her concurring opinion in *Bullcoming* that not everyone whose testimony may be relevant in establishing the accuracy of a testing device must appear in person as part of the prosecution's case. —— U.S. at —— n. 2, 131 S.Ct. at 2721 n. 2 (citing *Melendez–Diaz*, 557 U.S. at —— n. 1, 129 S.Ct. at 2532 n. 1). As regards the admissibility of Ex. 1, Foster's reliance on *Bullcoming* falls short.[6]

### 2. Admissibility under the Federal Rules of Evidence.

■ While the Certificate of Instrument Accuracy may be non-testimonial, it "must still meet all requirements of the Federal Rules of Evidence to be admitted" into evidence. *Christie*, 2009 WL 4499124, at *5 (citing *Bacas*, 662 F.Supp.2d at 486). Courts in this circuit have held that to be admitted, "certificates verifying the accuracy of equipment or its regular maintenance must, like all other types of out of court statements, qualify as non-hearsay or fit under a hearsay exception." *United States v. Williams*, No. 3:10cr130, 2010 WL 2802457, at *2 (E.D.Va. July 14, 2010). Ex. 1 contains an out-of-court statement by Melissa Kennedy regarding the accuracy of the Intox EC/IR II offered for the truth of the matter asserted. It is hearsay pursuant to Federal Rule of Evidence 801(c).

■ Rule 803(6) provides an exception to the hearsay rule for records "kept

6. Foster also directs the court's attention to section IV of *Bullcoming*, in which the Supreme Court references notice-and-demand procedures. In objecting to the admission of Ex. 1 at trial, Foster argued that the Virginia General Assembly requires certain notification be given when the prosecution intends to introduce a certificate in lieu of testimony, and defendant received no such notification in this case. Indeed, shortly after *Melendez–Diaz* was decided, the Virginia General Assembly amended Virginia Code § 19.2–187.1 to require the prosecution to notify the defendant of its intent to offer a certificate of analysis into evidence pursuant to § 19.2–187, and to notify defendant of his right to object to admission of the certificate of analysis in lieu of testimony. But Foster again blurs the line between a certificate of accuracy and a certificate of analysis in arguing he is entitled to notice that the government intended to introduce the Certificate of Instrument Accuracy in lieu of testimony. Virginia Code §§ 19.2–187 and 187.1 speak to the notification procedures required for introduction of certificates of analysis, not certificates of accuracy. A certificate of analysis was not introduced in

lieu of testimony in this case, as Ranger Smith, the administrator of the breath test, testified.

The court further notes that no such notification is required in this federal case, except as provided by the Federal Rules of Evidence, discussed *infra*. The Code of Federal Regulations does not contain a notification requirement similar to Virginia Code § 19.2–187.1, and because the C.F.R. specifically addresses DUI and accompanying tests on the Blue Ridge Parkway, 36 C.F.R. § 4.23, state law does not govern. 36 C.F.R. § 4.2 (traffic and the use of vehicles within a national park are governed by state law, "[u]nless specifically addressed by regulations in this chapter."); *see United States v. Farmer*, 820 F.Supp. 259, 263 (W.D.Va.1993) (finding 36 C.F.R. § 4.2 inapplicable because DUI and accompanying tests are specifically addressed in § 4.23); *United States v. Coleman*, 750 F.Supp. 191, 193 (W.D.Va.1990) (because the Code of Federal Regulations deals specifically with the issue of driving under the influence in national parks, federal law preempts state law on this issue).

in the course of a regularly conducted business activity, [ ] if it was the regular practice of that business activity" to keep such records. To lay a foundation for the admissibility of a business record, the proponent must establish that the record was (1) made contemporaneously with the act; (2) by a person with knowledge; (3) in the regular course of business; and, (4) that it was the regular practice of the business to keep such records. *Williams*, 2010 WL 2802457, at \*2; *Christie*, 2009 WL 4499124, at \*5; *Bacas*, 662 F.Supp.2d at 486. A custodian of records or other qualified witness may lay the foundation for the admission of these types of records.

■ Ranger Smith, a park ranger assigned to the Blue Ridge Parkway, is not the custodian of records for the Department of Forensic Science. The records custodian did not testify at trial. The issue, therefore, is whether Ranger Smith is an otherwise qualified witness under Rule 803(6). "A 'qualified witness' is not required to have 'personally participated in or observed the creation of the document,' or to have known who actually recorded the information. There is no requirement that the witness be able to personally attest to its accuracy." *United States v. Sofidiya*, 165 F.3d 22, 1998 WL 743597, at \*3 (4th Cir.1998) (per curiam) (unpublished table decision) (internal citations omitted). Rather, the term is interpreted broadly and "requires only someone who understands the system used to record and maintain the information." *Id.* "[H]e or she must be familiar with the creation and record keeping procedures of the organization in order to establish the record's trustworthiness." *Williams*, 2010 WL 2802457, at \*2; *accord Christie*, 2009 WL 4499124, at \*6; *Bacas*, 662 F.Supp.2d at 487.

The government has failed to establish that Ranger Smith is an otherwise quali-

fied witness under Rule 803(6) who can lay a foundation for the admission of Ex. 1. Ranger Smith offered no testimony regarding the creation of the Certificate of Instrument Accuracy and whether it was made contemporaneously with testing by a person with knowledge. He stated he does not know Melissa Kennedy, does not know whether she performed the testing and certification of the machine herself, and does not know whether the machine was calibrated properly at the time it was tested. Ranger Smith's testimony does not establish that he is familiar with the creation and record keeping procedures of the Department of Forensic Science. He is not tasked personally with maintenance of the Intox EC/IR II and has no knowledge of the machine's maintenance aside from what is set forth on Ex. 1. Ranger Smith cannot establish the trustworthiness of the document.

■ In the absence of live testimony from either the custodian of records or a qualified witness, "Rule 902(11) acts as 'the functional equivalent of testimony offered to authenticate a business record tendered under Rule 803(6),' permitting a declaration by the records' custodian or a qualified witness to verify authenticity." *Bacas*, 662 F.Supp.2d at 486 n. 7 (quoting *Rambus, Inc. v. Infineon Tech. AG*, 348 F.Supp.2d 698, 701 (E.D.Va.2004)); *see* Fed.R.Evid. 803(6) (certification that complies with Rule 902(11) can lay foundation for the admissibility of the business record). But Government's Ex. 1 contains no such declaration. The Certificate of Instrument Accuracy in this case is˙ signed by Melissa Kennedy, Section Supervisor, Breath Alcohol, and notarized. It certifies that the Intox EC/IR II "was found to meet all requirements for accuracy and performance established by the Department of Forensic Science." Gov't Ex. 1. There is no declaration from the records

custodian at the Department of Forensic Science, or another qualified person, verifying its authenticity. The certification does not state that this record was made at or near the time of the testing or from information transmitted by a person with knowledge of the testing, that this record was kept in the course of regularly conducted activity, and that it was made by the regularly conducted activity as a regular practice. Fed.R.Evid. 902(11); *cf. Bacas*, 662 F.Supp.2d at 483 n. 3, 486 (where two out of four certificates of accuracy offered by the government contained a signed certification that the documents were true and accurate copies of the original documents maintained in the normal course of business and therefore were admitted into evidence). Moreover, even if the document had contained such a declaration, the government failed to comply with the provisions of Rule 902(11), which require the party intending to offer the document to provide written notice of its intention and to make the record and declaration available for inspection sufficiently in advance of its offer into evidence, such that defendant has a fair opportunity to challenge it.

The government has not laid a proper foundation for admission of the Certificate of Instrument Accuracy. Because Government's Ex. 1 constitutes inadmissible hearsay to which no exception[7] applies, Foster's objection to its admission is **SUSTAINED** and the evidence will be excluded.

**B. Certificate of Blood Alcohol Analysis, Ex. 2.**

Foster also objects to the admission of Ex. 2, the BAC results from the Intox EC/IR II machine used to test Foster's breath. He claims this document is inadmissible pursuant to *Melendez–Diaz* because the government failed to bring a witness to testify as to the accuracy of the breathalyzer machine.

Defendant's argument is without merit. As discussed *supra*, live testimony concerning the accuracy of the Intox EC/IR II machine is not required under *Melendez–Diaz*. Foster does have a constitutional right, however, to confront the operator of the breath test machine that registered his BAC level at .12 grams per 210 liters of breath. He exercised that right at trial when he cross-examined Ranger Smith. Admission of Ex. 2, the Certificate of Blood Alcohol Analysis, does not violate the Confrontation Clause.

■ Furthermore, admission of Ex. 2 does not implicate the same hearsay concerns as Ex. 1. Ranger Smith, the person who conducted the breath test that generated the Certificate of Analysis, testified at trial. His testimony establishes that the document was made contemporaneously with the breath test given to Foster, by a person with knowledge, in the regular course of business. While he did not affirmatively state he is the custodian of such records, he testified that the machine generates three copies of the certificate, one of which Ranger Smith keeps for his records. At the very least, Ranger Smith falls under the broad definition of an otherwise qualified witness who is familiar with the creation and record keeping procedures of the National Park Service. The court is satisfied that Ex. 2 is admissible under the business records exception to the hearsay rule. *See United States v. Farmer*, 820 F.Supp. 259, 263 (W.D.Va. 1993) (finding certificate of analysis falls

---

**7.** The court notes that even if this document did qualify as trustworthy under the residual hearsay exception outlined in Federal Rule of Evidence 807, the government did not comply with this exception's notification requirement.

within the business records exception to the hearsay rule).

■ Foster argues, however, that the government has not proven the accuracy of the Intox EC/IR II and therefore Ex. 2 should be excluded. Indeed, the Code of Federal Regulations requires that "any test shall be conducted by using accepted scientific methods and equipment of proven accuracy and reliability by personnel certified in its use." 36 C.F.R. § 4.23(c)(4). There appears to be no dispute, and the court has no doubt, that the breath test was conducted using accepted scientific methods[8] and that Ranger Smith was certified in the use of the machine. The issue is whether the government has laid a proper foundation as to the accuracy of the machine to admit Ex. 2.

Authentication of a document is a condition precedent to admissibility, Fed. R.Evid. 901(a), and the proponent of the evidence has the burden of establishing its authenticity. 31 Charles A. Wright & Victor J. Gold, Federal Practice & Procedure: Evidence § 7104, at 34 (2000). Rule 901(b)(9) governs the authentication of data produced by a breathalyzer. To lay a foundation for the authentication of such evidence, a proponent must describe the process employed and the circumstances that demonstrate why the result is likely accurate. Wright & Gold, *supra*, § 7114, at 152–53. This may include proof that: 1) the type of device in question is accepted as reliable and as suitable for generating the sort of data offered in evidence; 2) the

specific device in question was in good working order at the time it generated the data at issue; and 3) the individual that operated the device was competent to do so. Wright & Gold, *supra*, § 7114, at 153. The standard for authentication, while not exacting, is a minimal one. Wright & Gold, *supra*, § 7104, at 36. A document can be authenticated when the evidence is sufficient to support a finding that the matter in question is what its proponent claims. Fed.R.Evid. 901(a); see Wright & Gold, *supra*, § 7104, at 34: *see also United States v. Vidacak*, 553 F.3d 344, 349 (4th Cir.2009). Satisfying this requirement may get the proponent of the evidence over the hurdle of admissibility; questions of reliability remain open, however, and the trier of fact has the power to decide what weight to attribute to the evidence after it has been admitted. Wright & Gold, *supra*, § 7103, at 21–23. Any defects in the foundation go to the weight of the evidence, not its admissibility. Wright & Gold, *supra*, § 7114, at 153; *see also Wells v. Liddy*, 37 Fed.Appx. 53, 63 (4th Cir.2002) (citing Weinstein's Federal Evidence § 901.02[3] (2d ed. 2001) for the proposition that issues the opponent raises about flaws in the authentication go to the weight of the evidence instead of its admissibility).

In this case, the court finds that the government has met the minimal requirement for authentication of Ex. 2 under Rule 901. Ranger Smith testified that he received training in the use of the Intox

---

8. The Fourth Circuit has held that "the reliability of the methodology, that is, the scientific technique by which breathalysers measure breath alcohol content, is well established." *United States v. Daras*, 164 F.3d 626, 1998 WL 726748, at *1 (4th Cir.1998) (unpublished table decision); *see also United States v. Brannon*, 146 F.3d 1194, 1196 (9th Cir.1998) (noting breathalyzers have been certified as accurate by the National Highway Traffic Safety Administration of the Department of Transportation and "[t]heir methodology is well-know and unchallenged." (citing 38 Fed.Reg. 30459 (1973))); *United States v. Hamblen–Baird*, 266 F.R.D. 38, 40 (D.Mass.2010) (quoting *Daras* ). Indeed, the Intox EC/IR II is listed on the Conforming Products List of evidential breath measurement devices. *See* 75 Fed.Reg. 11624–01 (Mar. 11, 2011).

EC/IR II and knows from that training that the machine performs a diagnostic function prior to taking a breath sample to ensure there is no alcohol in the air. He said that in this case, he observed Foster for the mandatory 20 minute period and informed Foster of his right to watch the entire test. He then took a breath sample after the machine completed its diagnostic phase. Ranger Smith testified he learned from his training (but not from experience) that if the machine had not been certified as accurate, it would have produced an error reading and may not have taken his operator card. The government's evidence of the machine's accuracy is thin, but the standard for authentication is minimal. The court finds Ranger Smith's testimony sufficient to support a finding that the certificate in question is what the government claims. The reliability of the BAC reading on the document, however, is a different question and is addressed *infra* in § IV.

In sum, the United States has laid a proper foundation for the admission of Ex. 2 into evidence. Because Ranger Smith was present and testified at trial, there is no Confrontation Clause issue. The document meets the hearsay exception under Rule 803(6) and has been authenticated properly. The questions Foster raises regarding the accuracy of the machine on the night in question affect the weight of the evidence—specifically, that Foster's BAC was in fact .12 grams per 210 liters of breath—not its admissibility. *See United States v. Reilly,* 33 F.3d 1396, 1409 (3d Cir.1994) ("It is well established that 'upon consideration of the evidence as a whole, if a sufficient foundation has been laid in support of introduction, contradictory evidence goes to the weight to be assigned by the trier of fact and not to admissibility.'"); *United States v. Catabran,* 836 F.2d 453, 458 (9th Cir.1988) ("Any question as to the accuracy of the printouts, wheth-er resulting from incorrect data entry or the operation of the computer program, as with inaccuracies in any other type of business records, would have affected only the weight of the printouts, not their admissibility." (citing Manual for Complex Litigation Second § 21.446 n. 81 (1985))); *see also* Wright & Gold, *supra,* § 7114, at 153. As such, defendant's objection to the admission of the BAC report must be **OVERRULED.** Ex. 2 will be admitted into evidence.

## IV.

Foster moves to dismiss the charge under 36 C.F.R. § 4.23(a)(1), claiming the government failed to establish that he was under the influence of alcohol to a degree that rendered him incapable of safe operation. To prove the elements of this offense, the government must show that Foster (1) was operating or was in actual physical control of a vehicle, (2) under the influence of alcohol, (3) to a degree of intoxication that rendered him incapable of unsafe operation. *United States v. Davis,* 261 F.Supp.2d 343, 347 (D.Md.2003). Clearly Foster was operating his vehicle on the night in question. The question is whether the government has met its burden of proving Foster was doing so while under the influence of alcohol to a degree of intoxication that rendered him incapable of unsafe operation.

"Federal case law applying § 4.23(a)(1) is sparse." *United States v. McFarland,* 369 F.Supp.2d 54, 57 (D.Me.2005), *aff'd* 445 F.3d 29 (1st Cir.2006). It is clear, however, that the totality of the evidence can establish that a defendant was intoxicated to a degree that rendered him incapable of safe operation. *See United States v. Coleman,* 750 F.Supp. 191, 196 (W.D.Va.1990); *see also McFarland,* 369 F.Supp.2d at 60 (applying a totality of the circumstances test). This evidence can include the defen-

dant's blood alcohol content, the officer's observations in the field, and defendant's performance on the field sobriety tests. *See United States v. French,* No. 2:08mj726, 2010 WL 1633456, at *4 (D.Nev. Apr. 22, 2010) ("The results of the field sobriety tests, combined with the officer's other observations may provide probable cause to arrest and may be sufficient to support a conviction for driving under the influence of alcohol in violation of 36 C.F.R. § 4.23(a)(1)."), *aff'd* No. 2:10–cv–1072, 2011 WL 90083 (D.Nev. Jan. 10, 2011); *Coleman,* 750 F.Supp. at 196 (results of blood alcohol test can be considered as one piece of evidence in the analysis under § 4.23(a)(1)). The government argues that the totality of the circumstances proves Foster's guilty beyond a reasonable doubt. The court disagrees.

### A. Evidence of Foster's Blood Alcohol Content.

■ The government correctly points out that the evidence of Foster's blood alcohol concentration has probative value for a charge under § 4.23(a)(1). *See Coleman,* 750 F.Supp. at 196. But the BAC results are "only one piece of evidence that must be considered" in a § 4.23(a)(1) analysis. *Id.* And although Ex. 2 met the minimal requirement for admissibility, the court sitting as the trier of fact can determine how much weight to give the evidence.

Section 4.23(c)(4) states that any breath test determining blood alcohol content "shall be conducted by using accepted scientific methods and equipment of proven accuracy and reliability operated by personnel certified in its use." While the Intox EC/IR II is generally accepted as a reliable device for testing a person's BAC, *see* 75 Fed.Reg. 11624–01 (Mar. 1, 2011) (listing the Intox EC/IR II on the Conforming Products List of evidential breath measurement devices), the government has offered almost no evidence to establish that this specific machine has been appropriately maintained, tested for accuracy, and was functioning properly on the night in question. As noted, *supra,* Government's Ex. 1, the Certificate of Instrument Accuracy, has been excluded from evidence as inadmissible hearsay and cannot be used to establish the Intox EC/IR II was working properly on April 3, 2011. *Cf. United States v. Daras,* 164 F.3d 626, 1998 WL 726748, at *2 (4th Cir.1998) (per curiam) (unpublished table decision) (where the court found the government had demonstrated reliability of equipment by submitting a printout establishing the machine had been tested and found to be accurate within the relevant time period). Additionally, there is no certification on the face of Ex. 2, the Certificate of Blood Alcohol Analysis, regarding the accuracy of the testing equipment. *Cf. Christie,* 2009 WL 4499124, at *1 n. 2 (where certificate of blood alcohol analysis itself contained attestation clause affirming that the equipment used to conduct the test had been tested within the past six months and found to be accurate). Ex. 2's attestation clause states only that the certificate is an accurate record of the test conducted, that the test was conducted using the type of equipment and in accordance with methods approved by the Department of Forensic Science, that the test was conducted in accordance with the Department's specifications, and that the operator possessed a valid license to conduct such a test. Gov't Ex. 2. It says nothing about whether the testing equipment had been tested for accuracy and was working properly at the time of the test.

The only evidence of the machine's accuracy comes from Ranger Smith. Ranger Smith testified that he received formal training in the operation of the Intox EC/IR II and had conducted multiple tests

and taken multiple samples in the course of that training. But this was his first time using the machine for a case-related test. Ranger Smith testified that he has no training or experience in the maintenance of the machine or generally in how the machine operates, except for the fact that he knows from training that the machine performs a diagnostic function. Specifically, he testified that when the machine starts up, it runs a diagnostic test, purges, and then runs a blank test to ensure there is no alcohol in the air before permitting a breath sample to be taken. Ranger Smith further testified that he has no independent knowledge of the accuracy of the machine. He stated he knows only from training, not from personal experience, that if the machine had not been certified as accurate, it would produce an error reading and it will not take his operator card. This evidence is simply not enough to establish that the machine was in good working order on the night in question. *Cf. Volk v. United States,* 57 F.Supp.2d 888 (N.D.Cal.1999) (where officer familiar with maintenance of the machine and an expert criminalist testified at trial as to the machine's accuracy).

The court is the trier of fact and in that capacity must determine what weight to give to the BAC reading contained in Ex. 2. *See United States v. Reilly,* 33 F.3d 1396, 1409 (3d Cir.1994) (contradictory evidence goes to the weight to be assigned by the trier of fact); *United States v. Catabran,* 836 F.2d 453, 458 (9th Cir.1988) (inaccuracies in the documents affect weight of the evidence). The Certificate of Blood Alcohol Analysis clearly indicates that Foster had been drinking; the question is whether he had been drinking enough to render him incapable of safe operation of his vehicle. Without evidence establishing that this specific Intox EC/IR II had been maintained appropriately and was working properly on the night in question, the court cannot give the .12 BAC reading any significant weight. As such, the court will consider the breath test results in Ex. 2 only to the extent that they establish that Foster had consumed alcohol on April 3, 2011. *See United States v. Stanton,* 501 F.3d 1093 (9th Cir.2007) (relying on breath test results to show defendant had been drinking despite having sustained objection to testimony about whether the results place defendant over the legal limit because government failed to lay a sufficient foundation for the evidence).

## B. Field Evidence.

The field evidence in this case is a bit of a mixed bag. Rangers Smith and Lyon both testified that at certain points, they observed that Foster had difficulty standing. But Foster's performance on the walk-and-turn test and the one-leg stand test calls into question any suggestion that Foster was unable to maintain his balance that evening.[9] On the walk-and-turn test, Foster was able to walk in a straight line, count out loud when prompted, maintain his balance, turn properly, and take the appropriate number of steps. Ranger Lyon testified that Foster failed to touch his heel to his toe leaving a gap on five of his eighteen steps, and to keep his arms at his side, both of which are clues of intoxication. On the one-leg stand test, Foster was able to hold one foot six inches in the air, point his toe and count "one, one thousand; two, one thousand" out loud for more than thirty seconds. Although Fos-

---

**9.** It is worth noting that Ranger Lyon testified that the one-leg stand test is the test that gives people the most trouble and is designed to test a driver's balance. Additionally, testimony in the case of *United States v. Stanton,* 501

F.3d 1093, 1100 (9th Cir.2007), cited by the government on brief, indicates that the walk-and-turn test is designed to test " 'many of the same skills needed for driving....' "

ter raised his arms more than six inches and swayed, he never put his foot down or lost balance. Overall, Foster did not perform poorly on these dexterity tests. And while six out of six clues were indicated on the horizontal gaze nystagmus test, this only confirms the fact that Foster had been drinking, a fact that Foster admitted.

In terms of other field observations, Ranger Lyon testified that Foster had an odor of alcohol about his person [10] and that his eyes were a bit bloodshot and watery. He briefly testified that Foster's speech was slurred. But there is no indication that Foster appeared confused or nervous. He had no trouble finding and handing over his license and registration. Foster admitted to "pre-gaming" before the Martinsville race hours earlier but no testimony was elicited regarding how much alcohol Foster had consumed. Nor is there any indication that Foster changed his story on that account over the course of the traffic stop.

With respect to the manner in which Foster was operating his vehicle, Foster was able to slow down and bring his vehicle to a stop when the ranger stepped into his lane of travel and motioned for him to do so. He was able to pull into the overlook parking lot at Ranger Lyon's direction and properly pull into a parking space. Notably, Ranger Lyon testified regarding his initial encounter with Foster, "All I could tell was that [Foster] had been consuming alcohol. . . . I did not know how much."

Ranger Lyon did not indicate that he observed any swerving, weaving or otherwise erratic driving by Foster. Rather, he pulled Foster over for traveling 55 mph in a 35 mph zone. At the time, Foster was driving downhill, just past an area where the speed limit dropped from 45 to 35 mph. Contrary to the suggestion made by the government on brief, speeding alone does not establish that defendant was intoxicated to a degree that rendered him incapable of safe operation. The government cites *United States v. Stanton*, 501 F.3d 1093 (9th Cir.2007), in support of the proposition that speeding shows defendant was not operating his vehicle properly. In *Stanton*, the Ninth Circuit held that the reasonable inference arising from the fact that defendant consumed numerous glasses of wine over the course of three hours, took a nighttime drive at 25 mph over the speed limit, and told the officer that he did not believe he was going that fast, supported the magistrate judge's conclusion that Stanton "was speeding but wasn't paying attention to what his speedometer said." 501 F.3d at 1100. The court did not find that speeding alone proved defendant was incapable of safe operation.

The Ninth Circuit ultimately held that a rational trier of fact could have concluded that Stanton was intoxicated to a degree that rendered him incapable of safe operation, and there were a number of facts to support that conclusion. The record established that Stanton attended a wine tasting on the night in question, drank numerous glasses of wine between 6:15 pm and 9:25 pm, stopped at his office briefly, and then headed home. 501 F.3d at 1095. He was pulled over for speeding 70 mph in a 45 mph zone. *Id.* The ranger noted he had a strong odor of alcohol about his person, his eyes were bloodshot, his speech was slow and deliberate, and his balance was unsure. *Id.* Stanton showed four of six clues on the horizontal gaze nystagmus test. He failed the walk-and-turn test by

---

**10.** The court notes that Foster admitted to drinking earlier in the day and there was an open container of alcohol on the passenger's side of the vehicle, both of which could have been responsible for the odor of alcohol.

losing his balance, stepping out of position, stepping off the line multiple times, taking an incorrect number of steps, turning incorrectly, and stopping his walk altogether at one point. *Id.* Additionally, Stanton performed so poorly on the one-leg stand test that the ranger stopped the test out of concern for his safety. *Id.* Over the course of the evening, Stanton changed his story about when he last had a drink and at one point stated, "I feel buzzed. I felt more of a buzz when you pulled me over." *Id.* at 1096. The results of the breathalyzer test conclusively showed that Stanton had been drinking, although the magistrate judge sustained a defense objection to testimony about whether the results placed Stanton over the legal limit, because the government failed to lay a sufficient foundation for the evidence. *Id.* Viewing the body of evidence as a whole and all reasonable inferences arising therefrom, the Ninth Circuit held that a rational trier of fact could have found beyond a reasonable doubt that Stanton was impaired to the point that he could not safely operate his vehicle. The court reversed the district court's ruling and upheld the magistrate judge's finding of guilt.

The facts in this case differ from those in *Stanton.* There is no evidence regarding how much Foster had to drink, he did not make any statements about his level of intoxication at the time he was driving his vehicle, and his performance on the field sobriety tests was markedly better. These facts also distinguish Foster's case from *Volk v. United States,* 57 F.Supp.2d 888 (N.D.Cal.1999), another case cited by the government on brief. In *Volk,* defendant was pulled over for speeding and failing to stop at a stop sign. 57 F.Supp.2d at 890. The officer noted an odor of alcohol on defendant's breath, that defendant's eyes were bloodshot and glassy, and that defendant swayed from side to side. *Id.* at 891. The officer administered a series of field

sobriety tests. Like Foster, Volk failed to touch heel-to-toe on one of the nine return steps, but unlike Foster, he made an immediate, about-face turn rather than taking small steps and pivoting per the instructions. *Id.* On the one-leg stand test, Volk swayed and hopped up and down on the planted foot. *Id.* The officer then asked Volk to write the letters of the alphabet on a piece of paper. Volk's letters were "somewhat jumbled" and he made mistakes at the middle and the end of the alphabet. *Id.* When asked to touch and count out loud each of the fingers on his hand, Volk "continually missed the fourth finger" and "'stumbled over' the number two when pointing to his middle finger." *Id.* A search of Volk's vehicle following his arrest uncovered a coffee cup containing a liquid with the appearance and odor of beer, an empty bottle of beer from underneath the driver's seat, and two empty bottles of malt liquor from behind the driver's seat. *Id.* at 892. Volk initially lied about having consumed alcohol and later admitted he had been drinking. *Id.* at 898. The breath test results revealed alcohol levels of .193 and .190. *Id.* at 892. The court found these results were properly admitted into evidence, despite the fact that defendant called the machine's maintenance and accuracy into question at trial, as an officer familiar with the maintenance of the machine and an expert criminalist both testified at trial regarding accuracy of the Intoxilyzer 5000. *Id.* at 897. Given all of this evidence, the court concluded that a rational trier of fact could have found Volk guilty of 36 C.F.R. § 4.23(a)(1) & (2).

The case of *United States v. Atkinson,* 128 Fed.Appx. 64 (10th Cir.2005), is also distinguishable from the instant case. Atkinson argued that the government could not prove he was illegally impaired at the time he was operating his motor vehicle, claiming he consumed several drinks of

whiskey after he had stopped driving. The trier of fact rejected Atkinson's argument, finding it unlikely that defendant and his passenger "had enough time for two of them to go to the bathroom separately, one after the other, and to stand there and trade two or three swigs out of a bottle of whiskey that contained approximately two inches" before making contact with the ranger. *Id.* at 67. In addition to this credibility issue, the facts underlying the stop supported the magistrate judge's finding that Atkinson was guilty of violating § 4.23(a)(1). The evidence of record revealed that after hiking 21 miles, Atkinson joined his colleagues at a bar where he consumed two pints of beer and a shot. *Id.* at 65. He then went to another bar, where he had another shot, waited about an hour, then drove home. *Id.* The ranger pursued Atkinson's vehicle after hearing the tires squeal and watching the driver do a roundabout. *Id.* at 65–66. Atkinson's vehicle was traveling about 60 mph in a 25 mph speed zone and pulled into a residential trailer area at such a high rate of speed that a cloud of dust formed. *Id.* at 66. Over the next 90 seconds, the ranger pulled in slowly after Atkinson (unsure of whether the vehicle had lost control), drove along a row of trailers, parked, got out, heard voices, and encountered defendant and his passenger. *Id.* The ranger administered the walk-and-turn test, on which Atkinson was unable to maintain balance, used his arms for balance, and stepped off the line. *Id.* On the one-leg stand test, he used his arms for balance and put his foot down. *Id.* The results of the Intoxilyzer breath test revealed his alcohol level was .146. *Id.* The magistrate judge found Atkinson guilty, rejecting defendant's contention that the Intoxilyzer results were not an accurate depiction of his level of intoxication at the time he was driving his vehicle because he drank whiskey after he got out of the car before the ranger approached him. The Tenth Circuit found sufficient evidence to support the conviction.

A case from this district cited by the government, *United States v. Coleman,* 750 F.Supp. 191 (W.D.Va.1990) (Michael, J.), also presents a set of facts that are distinguishable from those at issue here. In *Coleman,* the ranger approached defendant's vehicle while it was parked on the Blue Ridge Parkway, partially blocking a service road, with the key in the ignition. *Id.* at 192. The ranger spotted five empty beer cans outside of the driver's side of the car, and several others on the passenger's side. *Id.* The ranger noted an odor of alcohol emanating from the vehicle and observed that defendant's speech was slurred and that she gave confused responses to his questions. *Id.* Although she was able to perform some of the field sobriety tests administered by the ranger, she was:

> unable to complete satisfactorily a counting exercise; she was unable to touch her nose with her index finger (she touched her cheek instead); she was unable to perform properly a heel-toe walking test; and despite her claims that she understood Ranger Morris' instructions to the contrary, the defendant 'opened her eyes' during some of the tests and otherwise failed to comply with other instructions given to her.

*Id.* The ranger noted that throughout the interview, defendant had difficulty focusing on the conversation topic and maintaining rational, comprehensible speech. *Id.* at 192–93. A breath test conducted hours after her arrest indicated defendant's BAC was .09. *Id.* at 193. The magistrate judge found defendant guilty of violating 36 C.F.R. § 4.23(a)(1) after trial. The issue on appeal to the district court was whether defendant in fact was operating a motor vehicle. However, defendant also contend-

ed that the evidence was insufficient to establish she was intoxicated beyond a reasonable doubt. *Id.* at 195. The court affirmed the ruling, finding the magistrate judge was "more than justified in finding, beyond a reasonable doubt, that the defendant was impaired at the time of her arrest." *Id.* at 196.

While this case has some similarities to *Coleman,* there are important differences. In *Coleman,* five empty beer cans were discovered outside of the driver's window. A single beer can was discovered in Foster's vehicle, but it was found on the passenger's side. There is no evidence to suggest this beer was Foster's or that Foster had consumed alcohol during or close to the time he was operating the vehicle, unlike in *Coleman.* Additionally, there is nothing about Foster's demeanor that night to indicate he was confused, disoriented, incomprehensible, or that he had difficulty focusing.

The case of *United States v. Jones,* 403 F.Supp.2d 518 (W.D.Va.2005) (Sargent, J.), *aff'd* 428 F.Supp.2d 497 (W.D.Va.2006), also arising out of this district, is perhaps more instructive here. In *Jones,* a park ranger pulled over defendant's vehicle after seeing him drive past at a rapid rate of speed and weave in and out of traffic. 403 F.Supp.2d at 520. The ranger noticed a strong odor of alcohol on defendant's person and administered field sobriety tests. *Id.* at 521. Like in this case, the results of the field sobriety tests were mixed. The ranger testified that Jones failed part of the horizontal gaze nystagmus test, passed the finger count test, but fell off of the imaginary line during the walk-and-turn test. *Id.* Jones initially admitted to having consumed one beer in a short period of time, five to ten minutes before the stop, and later testified that he had consumed four additional beers approximately four

hours before the stop, which he did not mention to the ranger. *Id.* at 520 n. 6, 524. A breath test showed an alcohol content of .083 grams per 210 liters of breath. *Id.* at 521. He was charged with driving under the influence pursuant to 36 C.F.R. § 4.23(a).[11] After considering all of the evidence, including the breath test results showing Jones had a BAC above the legal limit, the magistrate judge was convinced beyond a reasonable doubt that Jones was operating a motor vehicle while under the influence of alcohol. Significantly, however, the magistrate judge noted that the strong odor of alcohol, Jones' admission of alcohol consumption, his performance on the field sobriety tests, and the results of a preliminary breath test, without more, would not "rise to a level sufficient to prove beyond a reasonable doubt that Jones was operating a motor vehicle while under the influence of alcohol." *Id.* at 525; *cf. United States v. Davis,* 261 F.Supp.2d 343 (D.Md.2003) (where the government failed to meet its burden of proving a violation of § 4.23(a)(1) when blood alcohol analysis ruled out the presence of alcohol and drugs other than marijuana in an unspecified amount, even though the evidence showed the defendant was driving erratically, responded to officers with nothing more than a blank stare, was disoriented, unable to provide his name and address or otherwise communicate, and had to be physically removed from the vehicle).

## V.

Unlike in *Jones,* the court does not have conclusive evidence that Foster's BAC was above the legal limit, although Ex. 2 does establish that Foster had been drinking on the night in question. *See Stanton,* 501 F.3d at 1096. Thus, the court must look

---

**11.** No subsection of § 4.23(a) was identified     specifically.

to the rangers' field observations and Foster's performance on the field sobriety tests in order to determine whether there is sufficient evidence to convict defendant of § 4.23(a)(1). The mixed field evidence makes this a close case. On one hand, Foster admitted to drinking earlier in the day; the ranger noted Foster had watery, blood shot eyes and an odor of alcohol about his person; and Foster showed some clues of intoxication on the field sobriety tests. On the other hand, there is no evidence to establish exactly how much Foster had to drink and when; Foster's driving was not erratic; he was oriented, focused and able to follow the ranger's instructions; and he was able to maintain his balance on the dexterity tests.

The court simply cannot find that Foster's performance on the field sobriety tests indicates he was incapable of safe operation of his vehicle. Given the government's high burden of proof, the court does not believe the evidence in this case rises to a level sufficient to prove beyond a reasonable doubt that Foster was intoxicated to a degree that rendered him incapable of safe operation of his vehicle. As such, the court finds Foster **NOT GUILTY** of violating 36 C.F.R. § 4.23(a)(1), and the charge will be dismissed. Judgment will be entered accordingly.