PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

　　　　　*Plaintiff-Appellee,*

v.

KRISTEN DEANNA SMITH,

　　　　　*Defendant-Appellant.*

No. 11-4336

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Roger W. Titus, District Judge.
(8:10-cr-00069-RWT-1)

Argued: September 21, 2012

Decided: December 17, 2012

Before DUNCAN, AGEE, and DIAZ, Circuit Judges.

Affirmed by published opinion. Judge Diaz wrote the opinion, in which Judge Duncan and Judge Agee joined.

## COUNSEL

**ARGUED:** William A. Mitchell, Jr., BRENNAN, SULLI-VAN & MCKENNA, LLP, Greenbelt, Maryland, for Appellant. Hollis Raphael Weisman, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee. **ON BRIEF:** Timothy J. Sullivan, BRENNAN, SULLIVAN

& MCKENNA, LLP, Greenbelt, Maryland, for Appellant.
Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee.

---

**OPINION**

DIAZ, Circuit Judge:

Kristen Deanna Smith was convicted by a jury of involuntary manslaughter during the commission of an unlawful act not amounting to a felony, in violation of 18 U.S.C. § 1112(a). The district court sentenced her to a term of fifty-one months' imprisonment.

Smith advances three arguments on appeal. First, she contends the district court erred by admitting expert testimony that she claims exceeded the scope of the government's pretrial disclosure. Second, Smith challenges the sufficiency of the government's evidence, arguing that the district court erred when it denied her motion for judgment of acquittal pursuant to Fed. R. Crim. P. 29. Finally, Smith contends the district court erred in rejecting one of her proposed jury instructions. We conclude that the district court committed no reversible error and that sufficient evidence supported the jury's verdict. Accordingly, we affirm.

I.

On appeal from a criminal conviction, we view the evidence in the light most favorable to the government. *United States v. Herder*, 594 F.3d 352, 358 (4th Cir. 2010).

A.

At about 3:00 a.m. on October 31, 2009, Amber Howard was driving south from Maryland into the District of Colum-

bia along the Baltimore-Washington Parkway, a federal area maintained by the National Park Service. As she approached D.C., she saw a car's lights coming toward her from the northbound side of the highway. She watched that car drive over the median, flip several times, and crash into the highway's southbound-side embankment.

Howard pulled over and dialed 911, then ran to check on the accident. She approached the car and heard a woman screaming for help. As Howard tried to indicate that help was on the way, the woman, appellant Kristen Smith, exited the wrecked vehicle through its rear passenger window and walked toward Howard. As Smith approached, Howard heard her say: "I never drink. I never drink. I didn't want to go out. I never drink. I only had one drink." Howard also saw the arm of Smith's passenger, Jabari Outz, hanging out the car window.

While waiting for the police to arrive, a distressed and disoriented Smith repeatedly wandered onto the highway, forcing Howard to pull her out of the road several times. Howard also smelled the odor of "white liquor" emanating from Smith. "White liquor," as Howard explained at trial, is alcohol such as vodka, gin, or tequila, and in Howard's experience as a bartender, has a smell distinct from dark liquor or beer.

United States Park Police Officer Gary Hatch arrived on the scene at about 3:30 a.m. and found Smith's car on its side, leaning against a stone wall. By this time, Outz had been pronounced dead on the scene by emergency medical services. Officer Hatch, who had some experience as an accident reconstructionist, analyzed the scene and determined that Smith's car had left the northbound roadway, flipped after crossing the median, and crashed into the stone wall.

Smith was taken to Prince George's County Hospital, where she submitted to a routine blood test.[1] U.S. Park Police

---

[1]Because the government was unable to establish the chain of custody of this blood sample, it did not attempt to introduce any evidence of its blood alcohol results.

Officer David Lorde was dispatched to stay with Smith while she received treatment in the emergency room. He testified that Smith was writhing in bed and making unsolicited statements, three of which he recalled in particular: "Don't ever drink and drive," "I just hope he's okay," and "Lock me up and throw away the key."

Some time later, U.S. Park Police Officer Ernest Patrick arrived at the emergency room to oversee a second blood draw, which was conducted at 5:47 a.m. The blood sample from this draw, which showed a blood alcohol content of .09 grams per 100 milliliters, was furnished to Lucas Zarwell, the Deputy Chief Toxicologist at the Office of the Chief Medical Examiner in Washington, D.C.

## B.

The government charged Smith in a single-count indictment for homicide during the commission of an unlawful act not amounting to a felony, in violation of 18 U.S.C. § 1112(a). The underlying unlawful act was an alleged violation of 36 C.F.R. § 4.23(a)(2), which provides that "[o]perating or being in actual physical control of a motor vehicle is prohibited while . . . [t]he alcohol concentration in the operator's blood or breath is 0.08 grams or more of alcohol per 100 milliliters of blood[.]" Notably, the government chose not to charge Smith with a violation of 36 C.F.R. § 4.23(a)(1), which prohibits operating a motor vehicle while "[u]nder the influence of alcohol . . . to a degree that renders the operator incapable of safe operation[.]" Unlike the "per se" § 4.23(a)(2) violation, § 4.23(a)(1) does not require the government to prove the defendant's blood alcohol level.

Deputy Chief Toxicologist Zarwell testified as an expert witness on the results of the 5:47 a.m. blood sample, stating that it contained .09 grams of alcohol per 100 milliliters of blood. Over the defense's objection, Zarwell also gave generalized testimony about how the human body metabolizes alco-

hol, including the average duration of alcohol absorption and rate of elimination. He indicated that typically people continue to absorb alcohol for "about 30 minutes" after they stop drinking and that females eliminate alcohol at an average rate of about .017 grams per 100 milliliters per hour. J.A. 120-21.

Prior to cross-examination, Smith renewed her objection to Zarwell's statements on alcohol metabolization, moving to strike this line of testimony on the ground that it exceeded the scope of the pretrial notice provided by the government. Pointing to a series of letters exchanged between counsel before trial, the defense charged that the government had represented that Zarwell's testimony would be limited to the results of Smith's 5:47 a.m. blood test. The defense argued that without explicit notice that Zarwell would be testifying about metabolization rates more generally, it was unprepared to effectively cross-examine Zarwell and unable to realistically procure a rebuttal witness. Smith did not move for a continuance or otherwise indicate that she wanted time to procure her own expert witness regarding blood alcohol absorption rates, although the court indicated that she could call her own witness in response to Zarwell's broadened testimony.

The district court denied the motion to strike, holding that the government's disclosures were sufficient. Zarwell's generic testimony, the court explained, was within his area of expertise and served as necessary background to his testimony on Smith's blood test result. Nor did the court find the admission of Zarwell's testimony to be unduly prejudicial, since Smith had the opportunity to cross-examine him and to find her own toxicology expert.

The district court also rejected the defense's alternative contention that Zarwell's testimony on generic human alcohol metabolization was irrelevant as to Smith's blood alcohol content at the time of the accident. Even though Zarwell had not offered an opinion as to Smith's blood alcohol content at 3:00 a.m., the court reasoned that the jury was not prohibited

from making inferences on that issue based on Zarwell's generic metabolization testimony and the results of the 5:47 a.m. test.

During cross-examination, Zarwell confirmed that his blood alcohol analysis showed the quantity of alcohol in Smith's blood only at the time of the 5:47 a.m. test, not beforehand. He also conceded, notwithstanding his earlier testimony about typical alcohol absorption and elimination rates, that those rates are highly variable among individuals. Zarwell stated that although he would have been able to conduct an individualized analysis of Smith's absorption and elimination rates, he had not done so. Zarwell also confirmed that he had not performed a retrograde extrapolation of Smith's blood alcohol level at the time of the crash and did not offer any opinion about her blood alcohol level at that time.

At the close of the government's case in chief, Smith moved for a judgment of acquittal under Fed. R. Crim. P. 29, arguing that the evidence produced by the government was insufficient to show her blood alcohol level exceeded .08 at the time of the accident, almost three hours before the blood test. The district court denied the motion, concluding that based upon the 5:47 a.m. blood test result, the evidence of Smith's erratic driving and behavior, and the statements she made at the hospital, a rational jury could reasonably infer that she had violated § 4.23(a)(2). Smith offered no evidence and renewed her motion for judgment of acquittal, which the district court again denied.

At the charge conference, Smith requested several supplemental jury instructions, one of which proposed to instruct the jury, in relevant part, as follows:

> As you heard, the rates of alcohol absorption and elimination can vary between persons. Therefore, the practice of extrapolating a person's blood alcohol level at the time of driving from a test of a blood

sample taken at a later time requires careful consideration of many factors . . . . I instruct you that you should not attempt to extrapolate the blood alcohol of the accused at the time of driving from the result of a blood test from samples taken at a later time unless sufficient evidence has been presented to you with regard to the aforementioned factors . . . . You may not infer from the test of defendant's blood samples taken at 5:47 a.m. on October 31, 2009, in this case—without more, as I have described above—what defendant's blood alcohol content at the time of driving around 3:00 a.m. might have been.

S.J.A. 3; J.A. 141.

The district court rejected this instruction. It explained that the jury already knew that there was no piece of evidence, standing alone, showing that Smith's blood alcohol content exceeded .08 at the time of the crash—an element the existing jury instructions already established was essential to the crime. But because there were other facts in the record from which the jury might reasonably infer the § 4.23(a)(2) violation, the court allowed the jury to draw those inferences.

The jury returned a guilty verdict on the sole count of the indictment. Prior to sentencing, Smith renewed her motion for judgment of acquittal and moved for a new trial. The district court denied both motions and imposed its sentence. This appeal followed.

## II.

The issues before us are (1) whether the district court erred in permitting the government's toxicology expert to testify about generic alcohol metabolization rates; (2) whether Smith was entitled to a judgment of acquittal due to insufficient evidence; and (3) whether the district court erred in refusing to

give Smith's requested jury instruction concerning blood alcohol level extrapolation. We consider each issue in turn.

A.

Smith contends the district court erred in permitting the government's toxicology expert to testify about generic alcohol metabolization rates. We review the district court's evidentiary rulings for abuse of discretion, *United States v. Basham*, 561 F.3d 302, 325 (4th Cir. 2009), and generally will not reverse absent a showing of prejudice, *United States v. Durham*, 319 F.2d 590, 592 (4th Cir. 1963).

Smith argues that she was unfairly surprised by toxicologist Lucas Zarwell's testimony regarding average human alcohol metabolization rates because this testimony exceeded the scope of the pretrial notice provided by the government pursuant to Fed. R. Crim. P. 16. As she did at trial, Smith points to the series of letters exchanged between counsel during discovery that comprised the parties' Rule 16 communications. J.A. 351-61. The government's initial written disclosure included Zarwell's *curriculum vitae* and named him as the likely toxicology expert. In response, Smith's counsel wrote: "It is assumed from your discovery response that the expert evidence would be limited to testimony . . . that [Smith's 5:47 a.m.] blood sample revealed an ethanol level of .09%." J.A. 359. The government's reply confirmed that Smith's characterization was "correct as to the toxicology expert testimony[.]" J.A. 361. Smith argues that since Zarwell's testimony was not confined to the results of the blood test, as the letters suggested it would be, the district court abused its discretion by admitting it. As a result, Smith claims she was unable to effectively cross-examine Zarwell on the intricacies of "relation-back" science[2] or prepare her own expert to rebut Zarwell's testimony.

---

[2]"Relation-back" science attempts to extrapolate—or relate back—the results of a blood alcohol test administered after a person's arrest to his or her blood alcohol level at the time of operation of the vehicle. *See Ransford v. District of Columbia*, 583 A.2d 186, 186 (D.C. 1990). As both parties have noted, the reliability of relation-back science is up for debate. Appellee's Br. at 29-30; J.A. 114.

The government echoes the district court's justification for admitting the evidence, arguing that Zarwell gave no testimony about Smith's personal alcohol elimination rate and that Zarwell's testimony concerning typical human alcohol metabolization was general background information within the scope of both the notice and his expertise. It notes that Smith never objected to Zarwell's qualifications as a toxicology expert and that, having sat down with Zarwell before trial for an in-person interview, Smith's counsel had ample opportunity to prepare for cross-examination. Finally, the government asserts that even assuming error, Smith has failed to demonstrate how she suffered any prejudice as a result of the testimony or the wording of the government's pretrial disclosure.

Federal Rule of Criminal Procedure 16(a)(1)(G) requires the government to give, at the defendant's request, a written summary of any expert testimony that it intends to use during its case-in-chief at trial. This summary "must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Fed. R. Crim. P. 16(a)(1)(G). As the rule's Advisory Committee Notes explain, Rule 16(a)(1)(G) "is intended to minimize surprise that often results from unexpected expert testimony . . . and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." Fed. R. Crim. P. 16(a)(1)(G) Advisory Comm. Note to the 1993 amendment.

On the one hand, we do not fault Smith for taking issue with the government's less than fulsome pretrial summary of Zarwell's planned expert testimony.[3] On the other hand, con-

---

[3]To be fair, the government's Rule 16 disclosure should be read in context; it was drafted in part to inform Smith that it would not be introducing the results of the earlier blood alcohol test, but would only be introducing the results of the second test. At trial, the government contended that one reason it sought to elicit Zarwell's generic testimony regarding blood alcohol absorption was Smith's sole defense—articulated during opening

sistent with the government's Rule 16 disclosure, Zarwell declined to offer any opinion on Smith's personal metabolization rate, and did not attempt to extrapolate what her blood alcohol content might have been at 3:00 a.m. And although full disclosure by the government would have been more in keeping with the spirit of Rule 16, we think it fair to characterize Zarwell's testimony on typical human alcohol absorption and elimination rates as generic background information that fell within the scope of Zarwell's expertise.

In any event, we need not decide whether the district court erred in concluding that the Government did not violate Rule 16(a)(1)(G), because any error was harmless. In addition to showing the district court's error, a defendant seeking reversal under Rule 16(a)(1)(G) must also "demonstrate prejudice resulting from the district court's decision to admit the contested testimony." *United States v. Buchanan*, 604 F.3d 517, 526 (8th Cir. 2010); *see also United States v. Charley*, 189 F.3d 1251, 1261-62 (10th Cir. 1999) (affirming a district court decision despite a Rule 16 violation, due to absence of prejudice to defendant).

Smith fails to make that showing here. Although Smith claims that the government's incomplete Rule 16 disclosure prevented her from effectively cross-examining Zarwell on the intricacies of relation-back science, Zarwell never offered any such evidence. Further, Smith interviewed Zarwell prior to the trial, and extensively cross-examined him at trial regarding the numerous factors that determine an individual's

---

statements—that the toxicology report only reflected Smith's blood alcohol level at the time it was taken and was irrelevant to her blood alcohol level at the time of the accident. *See United States v. Basic Constr. Co.*, 711 F.2d 570, 574 (4th Cir. 1984) (observing that while the practice of permitting evidence in the government's case-in-chief based on arguments made during a defendant's opening statement should be "discouraged," it may be harmless where the defendant "followed through on its articulated defense").

blood alcohol absorption rate, the nuances of his generalized direct testimony, and whether it was possible that a person's blood alcohol level would continue to increase for a few hours after consumption.[4] And to the extent Smith disagreed with Zarwell's testimony regarding general metabolization rates, the district court gave her ample opportunity to call her own rebuttal expert. Smith simply chose not to pursue that avenue or ask for a continuance to consider it.

For these reasons, we conclude that the district court did not commit reversible error in permitting Zarwell's expert testimony.

B.

We next consider Smith's argument that she was entitled to a judgment of acquittal because the government offered insufficient evidence to support her conviction. We review de novo the district court's decision to deny a defendant's Rule 29 motion for judgment of acquittal. *United States v. Smith*, 451 F.3d 209, 216 (4th Cir. 2006). On an appeal challenging the sufficiency of evidence, we assess the evidence in the light most favorable to the government, and the jury's verdict must stand unless we determine that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Young*, 609 F.3d 348, 355 (4th Cir. 2010).

Smith concedes that the government presented evidence that she was under the influence of alcohol at the time of the accident. She also concedes that the government's evidence established that her blood contained .09 grams of alcohol per 100 milliliters at 5:47 a.m., nearly three hours after the crash. Smith contends, however, that the government did not offer sufficient evidence upon which a rational finder of fact could

---

[4]Indeed, some of the testimony Smith elicited from Zarwell on cross-examination was favorable to her case.

have determined beyond a reasonable doubt that, *at the time she was operating her vehicle*, her blood alcohol concentration was .08 percent or more, as a 36 C.F.R. § 4.23(a)(2) "per se" violation requires. Absent such direct evidence, Smith insists, she was entitled to a judgment of acquittal.

The government responds that its evidence was sufficient to support the conviction. It argues that the fact that Smith had a blood alcohol content exceeding .08 percent within a reasonable period of the time after driving sufficed to show a violation of the § 4.23(a)(2) "per se" offense, without any need for relation-back evidence, which it argues is unreliable and impractical to obtain. While acknowledging that § 4.23(a)(2) does require a showing that a defendant's blood alcohol content exceeded .08 at the time of driving, the government suggests it would be absurd to hold that the "per se" offense requires the government to prove precisely the blood alcohol level at the time of driving. Instead, the government asks us to hold that a blood alcohol test taken within a reasonable time after driving satisfies the "per se" statute. Finally, the government points to other evidence supporting the jury's finding that Smith violated § 4.23(a)(2): evidence that Smith was driving recklessly, testimony that she was behaving erratically and that she smelled of "white liquor," and statements she made at the scene of the accident and at the hospital about her own drinking and driving.

Section 4.23(a)(2) provides that "[o]perating or being in actual physical control of a motor vehicle is prohibited while . . . [t]he alcohol concentration in the operator's blood or breath is 0.08 grams or more of alcohol per 100 milliliters of blood[.]" Unlike some comparable state statutes, § 4.23(a)(2) sets no explicit time limit for the taking of a blood alcohol test that may be used at trial to show a defendant's alcohol concentration. *Compare* 36 C.F.R. § 4.23(a)(2), *with* Va. Code. Ann. § 18.2-268.2A (setting a three-hour limit between "the offense" and the taking of the sample), *and* Md. Code Ann., Cts. & Jud. Proc. § 10-303(a)(2) (setting a two-hour limit

after the person has been "apprehended"). Section 4.23(a)(2) is also silent as to the regulation's proof requirements, and we have found no published authority from our sister circuits on this question, which has become the subject of some debate among other lower courts.

Some courts have interpreted § 4.23(a)(2) to mean that the government must directly prove a defendant's blood alcohol content at the time he or she was driving, often through relation-back testimony. For example, the United States District Court for the District of Nevada has twice refused to find later-administered breath tests sufficient to support a § 4.23(a)(2) conviction. *See United States v. French*, No. 2:08-MJ-726-GWF, 2010 WL 1633456 (D. Nev. Apr. 10, 2010) (unpublished); *United States v. Stout*, No. 2:09–MJ–00146–GWF, 2009 WL 5217047 (D. Nev. Dec. 28, 2009) (unpublished). As the *Stout* court reasoned:

> Unlike some state DUI laws, 36 C.F.R. § 4.23(a)(2) does not make it unlawful to have a blood alcohol level above the legal limit within a specified time after operating a motor vehicle. Nor does it contain a presumption regarding the person's blood alcohol at the time he was operating or in physical control of a vehicle based on subsequently obtained breath or blood test results. Because there is no presumption based on the test results, the Government is required to prove that a defendant's blood alcohol content was above the legal limit at the time of operating the vehicle and not merely at the time the breath or blood sample was taken.

2010 WL 1633456, at *6. Courts interpreting § 4.23(a)(2) to require relation-back evidence have also noted the availability to the government of proceeding under § 4.23(a)(1), which has no blood alcohol content requirement. *See United States v. Wight*, 884 F. Supp. 400, 402 (D. Colo. 1995). By choosing

to proceed on the "per se" violation, the *Wight* court explained, the government

> had an obligation under the regulation to establish the alcohol concentration at the time of driving or actual physical control. The test result at 8:27 a.m. was insufficient, in and of itself, to establish what Defendant's concentration was at 6:15 a.m., or even at 7:00 a.m. Once [the government] chose to proceed on the "per se" violation, it had to present qualified evidence that "related back" the test results to the time of driving or actual physical control.

*Id.* at 403.

Meanwhile, other courts dealing with similar "per se" statutes have held that relation-back testimony is unnecessary to prove the offense. And where, as here, those statutes impose no time limit on the blood alcohol test, courts have also regularly found that violations may be established as long as the government produces evidence of blood alcohol levels within a reasonable time after driving. *See, e.g.*, *Commonwealth v. Colturi*, 864 N.E.2d 498, 500 (Mass. 2007); *State v. McGowan*, 139 P.3d 841, 844 (Mont. 2006); *Ransford*, 583 A.2d at 190.

For example, in a case cited by the district court below, the Montana Supreme Court concluded that a comparable state "per se" statute could not be read literally "to require law enforcement officers to determine a person's alcohol concentration while driving . . . , as it would be impossible for an officer to administer a test while the suspect was driving." *McGowan*, 139 P.3d at 844. Nor, *McGowan* concluded, should the government be required to meet what it characterized as the "impossible burden" of presenting relation-back evidence. *Id.* at 845. Such extrapolation, the court explained, would require difficult-to-obtain evidence falling within a defendant's constitutional right to remain silent, such as when

and in what amounts the defendant consumed alcohol, and whether the defendant had recently consumed any food. *Id.* Another court, reaching the same conclusion, pointed out that even if the prosecution could obtain this information, "conclusive evidence of the blood alcohol content at the time of driving could still not be offered to the jury . . . because the rate of absorption of alcohol varies between individuals." *Ransford*, 583 A.2d at 190. These courts have concluded that legislatures could not have intended to impose such evidentiary hurdles on the prosecution. *Id.*; *McGowan*, 139 P.3d at 844-45.

We need not decide whether, on its own, a blood alcohol test taken within a "reasonable time" after driving can satisfy the proof requirement of § 4.23(a)(2)'s "per se" offense. Rather, it is enough for us to say that the government may, in some circumstances, establish a "per se" violation without direct evidence of the defendant's blood alcohol content while actually driving and without introduction of relation-back evidence.

In the instant case, we are satisfied that a rational finder of fact could have determined beyond a reasonable doubt that Smith violated the "per se" regulation. Even if Smith is correct that, standing alone, her 5:47 a.m. blood alcohol result was insufficient to establish the violation, this evidence did not actually stand alone. The government presented myriad other evidence supporting the jury's conclusion that Smith's blood alcohol level was over the legal limit while she was driving. Most notably, Zarwell's unrebutted testimony about typical alcohol absorption durations and elimination rates established that it was extremely unlikely that Smith could have registered a .09 percent blood alcohol content at 5:47 a.m. without having exceeded the .08 percent threshold at the time of the crash nearly three hours earlier.[5] Even accounting

---

[5]As the district court noted and as the government told the jury in its closing argument, there was no evidence that Smith had consumed any

for the wide range of individual alcohol metabolization rates to which Zarwell attested, and even assuming that Smith absorbs and eliminates alcohol much more slowly than the average woman, a rational juror could still have concluded beyond a reasonable doubt that a "per se" violation had occurred.

This is particularly true, as the district court noted, given the abundant other indicia of Smith's guilt. The evidence established that Smith was driving erratically and that she flipped her car over the highway's median strip. Howard testified that Smith was behaving erratically, wandering into the road, and that she smelled strongly of "white liquor." Smith also made statements to two witnesses about her own drinking and driving. To be sure, none of this evidence points definitively to Smith's precise blood alcohol level at the time of the accident. When coupled, however, with the result of the 5:47 a.m. blood alcohol test and Zarwell's generic metabolization testimony, this evidence could lead a rational juror to determine beyond a reasonable doubt that Smith had violated the regulation's .08 threshold.

Accordingly, we conclude that Smith was not entitled to a judgment of acquittal.

## C.

Finally, we address Smith's contention that the district court erred in refusing to give her requested jury instruction concerning blood alcohol level extrapolation. We review a district court's decision to give or refuse to give a jury

alcohol between the time of the accident and the time her blood was drawn. The jury could therefore reasonably infer that any alcohol that appeared in her 5:47 a.m. blood sample had been in her system at the time she was operating the vehicle, and that apart from the absorption of previously-consumed alcohol that Zarwell had described, there was no reason why Smith's blood alcohol concentration would have increased during that interim period.

instruction for abuse of discretion, and reverse only when the rejected instruction "(1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." *United States v. Passaro*, 577 F.3d 207, 221 (4th Cir. 2009) (internal quotation marks omitted). "Moreover, we do not view a single instruction in isolation; rather we consider whether taken as a whole and in the context of the entire charge, the instructions accurately and fairly state the controlling law." *Id.* (internal quotation marks omitted).

Smith contends that the district court erred in refusing to instruct the jury that it could not infer her guilt from the result of her 5:47 a.m. blood test, "without more." Absent this instruction, Smith argues, the jury was left to engage in conjecture and speculation about the results of the blood sample and its evidentiary value to the elements of the crime charged. The government responds that the court's instructions were complete and correct, and that they sufficiently explained to the jury that it could decide whether Smith had a .08 percent or more blood alcohol content at the time of the crash, based on all the evidence it heard.

We conclude that the district court did not abuse its discretion in refusing to give Smith's proposed instruction, because that instruction was not necessarily correct and, in any event, was "substantially covered by the court's charge to the jury." *Passaro*, 577 F.3d at 221. As the district court noted, Smith's proposed instruction that the jury could not infer guilt from the 5:47 a.m. blood test, "without more," could easily have led to confusion about what other evidence the jury was allowed to consider. By the same token, the proposed instruction also improperly implied that, beyond the 5:47 a.m. blood test, there was no other evidence supporting an inference of guilt.

The district court's instructions set forth the elements of the crime and made clear the government's burden of proving

beyond a reasonable doubt that at the time of the accident Smith's blood alcohol content was .08 or higher. Even as it recognized that there was no direct evidence that Smith's blood alcohol content exceeded the .08 threshold while she was driving, the district court rightly concluded that there were facts in the record from which the jury might reasonably infer the violation and instructed the jury that it was free to either make that inference or not. Ultimately, when "[t]aken as a whole and in the context of the entire charge, the instructions accurately and fairly state[d] the controlling law." *Passaro*, 577 F.3d at 221. As a result, the district court did not abuse its discretion in denying Smith's proposed instruction.

## III.

In sum, the district court did not abuse its discretion in admitting the toxicologist's generic testimony on alcohol metabolization. Nor was Smith entitled to judgment of acquittal, because the government's evidence was sufficient to support the jury's verdict. Finally, the district court did not abuse its discretion in denying Smith's proposed jury instruction. Accordingly, we affirm the judgment of the district court.

*AFFIRMED*