**UNITED STATES of America**

v.

**Velvet C. WEBB.**

**Criminal No. 5:12–mj–0171.**

United States District Court, S.D. West Virginia, Beckley Division.

Signed Oct. 3, 2013.

C. Haley Bunn, U.S. Attorney's Office, Charleston, WV, John L. File, U.S. Attorney's Office, Beckley, WV, for United States of America.

Rhett H. Johnson, Federal Public Defender's Office, Charleston, WV, for Velvet C. Webb.

## MEMORANDUM OPINION AND ORDER

R. CLARKE VANDERVORT, United States Magistrate Judge.

By Violation Notice No. 3173204 dated September 13, 2012, Defendant was charged with driving under the influence of alcohol in violation of 36 C.F.R. 4.23(a)(2). (Document Nos. 1 and 2.) National Park Service Law Enforcement Ranger Justin Cawiezel stated in the Violation Notice's Statement of Probable Cause for arresting Defendant that at about 3:00 in the morning on September 13, 2012, he responded to a 911 call that a car had been driven into the river at the Grandview Sandbar in the New River Gorge National River. Arriving there, he found Defendant. He stated, "I could smell the faint odor of alcohol on WEBB's breath, her speech was slurred and her clothes and hair were wet with mud on her jeans." Ranger Cawiezel stated that he administered the standard field sobriety test and Defendant failed. He then administered a portable breath test [PBT] at 3:28 a.m. which indicated .107. He arrested Defendant at that point and took her to the Beckley Police Department. Ranger Cawiezel wrote that an Intoxilyzer test was administered there at 4:20 a.m. indicating .094.

After several continuances (Document Nos. 6, 8, 10, 12 and 14.), the Court held a bench trial on June 11, 2013, with Assistant United States Attorney C. Haley Bunn representing the United States and Assistant Federal Public Defender Rhett H. Johnson representing Defendant. The United States called four witnesses and introduced eight exhibits. Ranger Cawiezel testified on direct examination that at about 1:45 a.m. on September 13, 2012, he received a call from a 911 operator reporting that a woman who sounded intoxicated called stating that her car was in the river and arrived on the scene at 2:31 a.m.[1] (Transcript [Tr.] at p. 5–6.) When he got there, fire department and ambulance personnel were there. As he spoke with them briefly, he saw a woman "coming out of the wood line off of the sandbar trail that goes down to the actual sandbar." (Tr. at p. 6.) He determined that she was the woman who made the 911 call and learned her name, the Defendant in this matter. (Id.) Ranger Cawiezel testified that "her clothes

---

1. Ranger Cawiezel was not on duty but was at home when he received the phone call from the 911 operator.

were wet. Her hair was wet. She was visibly upset. Her speech was a little slurred. I could smell the odor of an alcoholic beverage on her breath slightly and her jeans were wet and mud on her clothes as well." (Tr. at p. 7.) Ranger Cawiezel's immediate concern was whether anyone else was in the car. Defendant told him that no one else was in the car, and Ranger Cawiezel proceeded to attempt to determine what happened. Defendant told him that she had four beers and, trying to get down to the sandbar area, mistook the boat ramp for the road to the sandbar area and drove her car into the river. She stated that she realized her mistake when she felt water on her skin and got out of the vehicle through the driver's side window. (Tr. at pp. 7–8.) Defendant told Ranger Cawiezel the make and model of the car and informed him that it belonged to her boyfriend's son. (*Id.*) Ranger Cawiezel then testified that he administered a field sobriety test including the horizontal gaze nystagmus [HGN] test. Defendant's counsel objected on grounds that the results of the field sobriety test are not relevant because the regulation under which Defendant is charged, 36 C.F.R. § 4.23(a)(2), requires proof of a specific blood alcohol content. Defendant's counsel acknowledged that the results of field sobriety tests provide probable cause to administer blood alcohol testing and stipulated to probable cause. (Tr. at pp. 9–10.) Having administered the field sobriety test, Ranger Cawiezel placed Defendant under arrest for suspicion of DUI and administered a portable breath test [PBT]. (Tr. at p. 11.) Counsel for the United States did not inquire respecting the result of the PBT. Ranger Cawiezel testified that at 3:28 a.m. he transported Defendant to the Beckley Police Department and arrived there at about 4:00 a.m. (Tr. at p. 12.) Ranger Cawiezel testified that he then returned to the scene to assist in the recovery of the car and left the scene to attend Defendant's initial appearance. (*Id.*) Defendant's counsel asked Ranger Cawiezel on cross examination specific probing questions about Defendant's conduct and demeanor in the early morning hours of September 13, 2012, attempting to establish the extent to which Ranger Cawiezel was testifying from memory or based upon documents produced contemporaneously. (Tr. at pp. 13–21.)

The United States then called Ranger Oaks. Ranger Oaks assisted in recovering the car from the river, searched it and took pictures of the car and some of its contents. Ranger Oaks testified on direct examination that he took pictures of the car with the keys in the ignition-on position and the floor shifter in first gear. He also testified that he found four beer cans in the car, one 12 ounce and three 24 ounce, and took pictures of them. (Tr. at p. 27.) The photographs were admitted into evidence as Exhibit Nos. 1 through 6. Defendant's counsel inquired on cross examination about other items in the car which appeared to be trash and asked why Ranger Oaks did not take pictures of or inventory them. (Tr. at pp. 28–30.)

Lieutenant Ragland of the Beckley City Police Department was the United States' third witness. On Defendant's arrival at his office in the custody of Ranger Cawiezel, Lieutenant Ragland administered an intoximeter test using an EC/IR II breath testing intoximeter. Lieutenant Ragland testified on direct examination that prior to administering the intoximeter test he waited for a 20–minute period to assure that Defendant did not smoke, eat or drink. (Tr. at p. 33.) Then, as counsel for the United States began inquiring about the results and submitting a printout of them marked as Exhibit No. 7 into evidence, Defendant's counsel objected on grounds that the United States had not

introduced evidence respecting the maintenance, accuracy and reliability of the intoximeter machine which Lieutenant Ragland used.[2] (Tr. at p. 35.) The undersigned sustained the objection allowing counsel for the United States to introduce foundational evidence. Counsel for the United States stated that the parties stipulated to the information contained in the maintenance log of the intoximeter which indicated that the intoximeter was tested before and after the date when Defendant was tested and therefore was working properly then. Defendant's counsel responded reading e-mail correspondence between him and counsel for the United States stating that "I'm willing to stipulate that the EC/IR II was tested on those dates and stipulate to the admission of the log sheet itself, but in doing so, I'm not stipulating that the machine was working properly on 9/13/2012." (Tr. at pp. 36–37.) Lieutenant Ragland testified that he performed a system check on the intoximeter and believed that the machine was properly maintained when he tested Defendant. (Tr. at p. 38.) Counsel for the United States attempted again to introduce a printout of the results of the test, and Defendant's counsel objected on grounds that there had been no evidence respecting accepted scientific methods as required under 36 C.F.R. § 4.23(c)(4). (Tr. at pp. 38–39.) The undersigned overruled Defendant's objection and admitted the printout into evidence stating that "I think we have plenty of evidence that Officer Ragland is qualified to administer the exam and that ... particular attention was paid to the machine and all of the practices and policies that apply to its operation." (Tr. at p.

39.) Lieutenant Ragland then testified that the printout indicated that the intoximeter machine performed and passed a system check before and after Defendant was tested. Lieutenant Ragland testified that the test of Defendant indicated that her BAC was .094 and he believed that the test result was accurate. (Tr. at p. 40.) Defendant's counsel then inquired on cross examination about circumstances which might contaminate the results, whether Lieutenant Ragland would know if the intoximeter was wrong in performing system checks, whether Lieutenant Ragland knew of any margin of error and competence/confidence level for the machine, Lieutenant Ragland's experience with other intoximeters, when the machine was calibrated, the formula or ratio for converting breath to blood alcohol content and other matters which might have affected the results. (Tr. at pp. 41–50.) While Lieutenant Ragland did not know much, if anything, about the intoximeter used to test Defendant technically or scientifically, he testified that he administered the test at 4:20 a.m. on September 13, 2012, as he had been trained and was certified to do and could not determine what Defendant's BAC might have been at 1:30 or 2:30 that morning. (Tr. at pp. 48–49.) On redirect examination, Lieutenant Ragland testified that if the intoximeter was not operating properly, it would have indicated it on the printout and it did not do so. (Tr. at p. 51.) Defendant's counsel had no further questions of Lieutenant Ragland but renewed his objection to the admission of the printout of the results of Defendant's intoximeter testing under 36 C.F.R. § 4.23(c)(4) stating that "[w]e haven't

---

**2.** The printout (Exhibit 7.) indicates that on September 13, 2012, Lieutenant Ragland used an Intox EC/IR II intoximeter to test Defendant. The printout indicates "System Check: *Passed*", Defendant's BAC at 4:20 that morning as .094 grams of alcohol per 210 liters of

breath and then "Test Status: *Success*". The printout does not contain an attestation clause. The United States did not introduce in evidence any document certifying the accuracy of the EC/IR II intoximeter when Defendant was tested or Defendant's test result.

heard anything about science." (Tr. at p. 52.) The undersigned stated that "I'm uncertain as to the foundational requirements as they apply in this particular case ... so I'd like to have as much evidence and information as I can, and I'm not going to rule after this at all, but rather, I'm going to go back and look at the law on this and determine whether or not we have enough information from a federal standpoint to admit that exhibit. So I'm admitting it provisionally." (Tr. at p. 53.) The United States then introduced a four-page Log Sheet for the intoximeter including a Monthly Intox EC/IR II Inspection Form dated September 26, 2012, and these documents were admitted as Exhibit No. 8.[3]

Ms. Shelia Shelton was the United States' final witness. Ms. Shelton testified on direct examination that she was camping and vacationing with her fiancé at the Grandview Sandbar in the evening hours of September 12 and morning hours of September 13, 2012. (Tr. at p. 56.) She stated that "an intoxicated lady" came to their campsite three times that evening/morning. The first time was sometime "[a]fter 10:00 to midnight. I'm not sure." (Tr. at p. 58.) Ms. Shelton testified that "[s]he said she heard our music and wanted to party at our site because she liked our music." (Tr. at p. 57.) The second time was about an hour later and the third time was about an hour after

that. (*Id.*) Ms. Shelton testified that she believed that the woman was intoxicated because "[s]he had ... the slurred speech. She was falling, tripping." (Tr. at p. 59.) She stated that each time the woman came to their campsite she was more intoxicated than the time before. (Tr. at p. 60.) Ms. Shelton testified that the first time she came to their campsite, "she drove out." (*Id.*) The next two times she walked and the last time she asked for help and offered to pay $50 to anyone who would help her. (*Id.*) Ms. Shelton did not positively identify Defendant as the woman who came to her campsite that night but acknowledged that "[s]he looks familiar, but I'm going to say it was dark." On cross examination, Ms. Shelton reiterated that a woman came to her campsite three times sometime after 10:00 p.m., drove a car the first time, walked the second and third times and was more intoxicated each time. (Tr. at pp. 62–63.) The United States rested, and Defendant offered no evidence. Counsel for the United States then made her closing argument summarizing the evidence which the United States had submitted and urging the Court to conclude that the United States had met its burden of proving Defendant guilty of violating 36 C.F.R. § 4.23(a)(2) beyond a reasonable doubt. (Tr. at pp. 65–67.) Defendant's counsel then made his Rule 29 Motion and closing argument. Defendant's counsel emphasized that Defendant is charged un-

---

**3.** The Log Sheet indicates each time the EC/IR II was used between August 16 and October 14, 2012, who operated it and the results of each operation. The Log Sheet indicates that the intoximeter used to test Defendant was used to test numerous people over that two month period of time. Lieutenant Ragland only operated it once during that period in testing Defendant. The Log Sheet indicates that the intoximeter used to test Defendant was tested on August 20 and September 26, 2012. The Inspection Form indicates that a West Virginia State Police Officer inspected the intoximeter on September 26, 2012, by examining "expendable supplies" (mouthpieces, printer paper, log sheets and DWI information sheets) and checking the machine for cleanliness, damage, correct connections and proper operation. The United States did not introduce a copy of an Inspection Form for the month of August, 2012, indicating that the machine was inspected prior to Defendant's testing. The documents do not contain any attestation or certification of accuracy of the machine over the period.

der 36 C.F.R. § 4.23(a)(2), the *per se* offense, not (a)(1). Defendant's counsel stated that in view of this charge, the United States was required to prove that Defendant was driving and at the time she was driving her BAC was .08. (Tr. at p. 67.) The undersigned interrupted Defendant's counsel to indicate that Ranger Cawiezel wrote in his Statement of Probable Cause that Defendant admitted that she drove the car into the river but no one actually testified to seeing her do so. (Tr. at 68–70.) Defendant's counsel then resumed his argument contending essentially that the United States did not prove that Defendant was driving the car with a BAC of .08 or above. Defendant's counsel asserted further that there was no evidence respecting when Defendant drove her car into the river or what she might have done after that. Defendant's counsel stated that "[s]he could have found other campers to party with. He didn't ask. She didn't testify. This Court doesn't know what was going on. She could have very well consumed alcohol beyond that point." (Tr. at p. 70.) Defendant's counsel further asserted that the United States did not introduce evidence extrapolating back from the intoximeter test results at 4:20 a.m. to prove what Defendant's BAC might have been when she drove the car into the river. (Tr. at 70–71.) Defendant's counsel then cited and discussed three cases favoring his positions.[4] (Tr. at 71–73.) Counsel for the United States then argued that Ms. Shelton testified that the first time the intoxicated woman came to her campsite, she saw the woman drive off in a car which she described and was similar to the car which Defendant drove into the river. (Tr.

at p. 75.) Counsel for the United States further discussed consistent and corroborating evidence in support of the charge that Defendant was driving the car with a .08 or higher BAC. (Tr. at pp. 74–76.)

On June 13, 2013, the United States filed a Memorandum of Law in Support of Admissibility of Intoximeter Results. (Document No. 16.) The United States cited several cases[5] in which Courts found the EC/IR II a reliable testing device which will not produce a printout of results without first performing a system check to assure that it is working properly and the printout of test results is admissible through the testimony of the person who administered the test.

On June 24, 2013, Defendant filed a Memorandum in Opposition to the EC/IR II Test Results. (Document No. 20.) Defendant asserts that the United States did not provide an adequate foundation for admission of the test results but, if the Court finds that it did, the test results should be given little probative value. Defendant contends that the United States was required to introduce evidence respecting the testing process and system and its accuracy and reliability. Defendant asserts that though the maintenance log (Exhibit No. 8.) indicates that preventative maintenance was performed on the intoximeter on August 20 and September 26, 2012, it does not indicate when actual maintenance and repair was performed. Defendant urges that Lieutenant Ragland's testimony that the machine works because it says it does is not enough of a foundation to support the admission of the test results into evidence. Alternatively,

---

**4.** *United States v. Wight,* 884 F.Supp. 400, 403 (D.Colo.1995); *United States v. Rauhof,* 2006 WL 3455066 (W.D.Va.); *United States v. Foster,* 829 F.Supp.2d 354, 358 (W.D.Va.2011).

**5.** *United States v. Foster,* 829 F.Supp.2d 354, 358 (W.D.Va.2011); *United States v. Griffin,* 2009 WL 3064757 (E.D.Va.); *United States v. Christie,* 2009 WL 4499124 (E.D.Va.) *United States v. Hamblen–Baird,* 266 F.R.D. 38 (D.Mass.2010).

citing *United States v. Foster*, 829 F.Supp.2d 354, 369 (W.D.Va.2011), in which the Court gave little weight to the test results of an EC/IR II intoximeter when there was no evidence that the machine "had been maintained appropriately and was working properly on the night in question," Defendant urges that this Court do the same.

## DISCUSSION

36 C.F.R. § 4.23 provides as follows insofar as its language pertains to this matter:

(a) Operating or being in actual physical control of a motor vehicle is prohibited while:

(1) Under the influence of alcohol ... to a degree that renders the operator incapable of safe operation; or

(2) The alcohol concentration in the operator's blood or breath is 0.08 grams or more of alcohol per 100 milliliters of blood or 0.08 grams or more of alcohol per 210 liters of breath.

\*     \*     \*

(c) Tests.

\*     \*     \*

(3) Any test or tests for the presence of alcohol ... shall be determined by and administered at the direction of an authorized person.

(4) Any test shall be conducted by using accepted scientific methods and equipment of proven accuracy and reliability operated by personnel certified in its use.

(d) Presumptive levels.

(1) The results of chemical or other quantitative tests are intended to supplement the elements of probable cause used as the basis for the arrest of an operator charged with a violation of paragraph (a)(1) of this section. If the alcohol concentration in the operator's blood or breath at the time of testing is less than alcohol concentrations specified in paragraph (a)(2) of this section, this fact does not give rise to any presumption that the operator is or is not under the influence of alcohol.

(2) The provisions of paragraph (d)(1) of this section are not intended to limit the introduction of any other component evidence bearing upon the question of whether the operator, at the time of the alleged violation, was under the influence of alcohol. . . .

36 C.F.R. § 4.23(a)(2) is regarded a "per se" statute. *United States v. Smith*, 701 F.3d 1002, 1009 (4th Cir.2012.) Proof of a violation of 36 C.F.R. § 4.23(a)(2) is accomplished by means of evidence obtained through an acceptable testing procedure that the alcohol concentration in the breath of the person charged was 0.08 grams or more of alcohol per 210 liters of breath when she was operating or in actual physical control of a motor vehicle. No additional proof such as proof of impairment is necessary. As the Fourth Circuit pointed out in *United States v. Smith*, 701 F.3d at 1009–1010, some Courts have found that 36 C.F.R. § 4.23(a)(2) requires the introduction of evidence or testimony respecting the concentration of alcohol in the breath of the person charged when she was actually operating the motor relating or extrapolating back from testing some time thereafter and other Courts considering similar "per se" statutes have not, finding evidence of the person's BAC obtained within a reasonable time after driv-

ing sufficient.[6] The Court did not adopt either approach, but in view of the facts underlying Ms. Smith's conviction, stated, "Rather, it is enough for us to say that the government may, in some circumstances, establish a 'per se' violation without direct evidence of the defendant's blood alcohol content while actually driving and without introduction of relation-back evidence." *United States v. Smith*, 701 F.3d at 1010–1011. Ms. Smith was charged under 18 U.S.C. § 1112(a) with involuntary manslaughter while driving under the influence of alcohol in violation of 36 C.F.R. § 4.23(a)(2). Evidence was introduced at trial that at about 3:00 a.m. on October 31, 2009, Ms. Smith lost control of her car while driving within an area policed by the National Park Service, drove over a median, flipped her car and crashed it into an embankment. A passenger in her car died in the accident. A woman who had experience as a bartender witnessed the accident and Ms. Smith's conduct thereafter before the police arrived. The woman reported that Ms. Smith was distressed and disoriented, repeatedly wandered onto the highway, smelled of "white liquor" and stated that she never drank, did not want to go out and only had one drink. A federal police officer arrived on the scene at about 3:30 a.m. and, after determining what happened, took Ms. Smith to the hospital. Ms. Smith continued to act erratically there and make comments about drinking. Her blood was drawn at 5:47 a.m. and found to contain .09 grams of alcohol per 100 ml. These results were given to a toxicologist. The toxicologist did not determine Ms. Smith's BAC at the time of the accident based upon the results of the blood test nearly three hours later but testified that given "typical alcohol absorption durations and elimination rates . . . it was extremely unlikely that Smith could have registered a .09 percent blood alcohol content at 5:47 a.m. without having exceeded the .08 percent threshold at the time of the crash nearly three hours earlier." *United States v. Smith*, 701 F.3d at 1011. Ms. Smith was convicted of the offense and sentenced to a 51 month term of imprisonment. Considering a number of issues on appeal including whether there was sufficient evidence to prove Ms. Smith's violation of 36 C.F.R. § 4.23(a)(2), the Fourth Circuit determined that all of the evidence taken together and "[m]ost notably" the testimony of the toxicologist "could lead a rational juror to determine beyond a reasonable doubt that Smith had violated the regulation's .08 threshold." *Id.*

In *United States v. Ahlstrom*, 530 Fed. Appx. 232 (C.A.4 (Va.) 2013), a prosecution under 36 C.F.R. § 4.23(a)(2) which resulted in conviction, the Fourth Circuit considered a challenge to admission of a printout of intoximeter test results and the weight which the District Court gave to them. The printout indicated that the intoximeter was approved by the National Highway Traffic Safety Administration [NHTSA], and the attestation clause stated that the intoximeter had been certified accurate within 90 days before Ms. Ahlstrom's testing by a person certified to calibrate and conduct accuracy checks upon the equipment. The Fourth Circuit stated that "[t]he regulation at issue, 36 C.F.R. § 4.23(c)(4), does not purport to impose a heightened standard for the admissibility of machine-generated evidence." *Id.* at 238. The Court stated further that "NHTSA certification is widely accepted by courts as evidence of a device's reliability." *Id.* at 239. The Court indicated that the statement contained in the attestation

---

**6.** The Court also noted that "[u]nlike some comparable state statutes, § 4.23(a)(2) sets no explicit time limit for taking of a blood alcohol test that may be used at trial to show a defendant's alcohol concentration." *United States v. Smith*, 701 F.3d at 1010.

clause and testimony of the officer who administered the test upon Ms. Ahlstrom that the intoximeter performed a self-diagnostic function before use and would not operate if it did not pass it sufficed to prove the intoximeter's accuracy when Ms. Ahlstrom was tested. *Id.* at 240. For these reasons, the Fourth Circuit found no error in the District Court's admission of the printout of the intoximeter test results and the weight which the District Court gave them. *Id.* In *United States v. Foster,* 829 F.Supp.2d 354 (W.D.Va.2011), a prosecution under 36 C.F.R. § 4.23(a)(1), the District Court considered whether or not a Certificate of Instrument Accuracy respecting an EC/IR II intoximeter and a Certificate of Blood Alcohol Analysis from that machine indicating a BAC of .12 were admissible. The Court determined that while the Certificate of Instrument Accuracy was non-testimonial, its admission in evidence was proper under Federal Rule of Evidence 803(6) through a person designated as a custodian of such forensic records or other qualified witness.[7] The United States attempted to introduce the document through a National Park Service Ranger who was neither, and the Court excluded it because the United States had not laid a proper foundation for its admission. *United States v. Foster,* 829 F.Supp.2d at 363–365. The Court then considered Mr. Foster's claim that the United States did not prove the accuracy of the EC/IR II and the Certificate of Blood Alcohol Analysis should be excluded. The Court determined that the Certificate of Blood Analysis was admissible through the testimony of the Ranger. The Ranger testified that he was trained to operate the EC/IR II and had no knowledge respecting how the machine works. The Ranger testified that before a breath test can be performed, the machine performs a self-diagnostic test to assure that there is no alcohol in the air and will not operate unless it is certified as accurate. The Ranger testified that Mr. Foster was the first person he tested on the EC/IR II. The Ranger testified that he observed Mr. Foster for twenty minutes and after the machine went through its diagnostic phase, took a sample of Mr. Foster's breath. The Court found that the United States had laid a proper foundation for the admission of the Certificate of Blood Analysis through the Ranger's testimony, but "questions Foster raises regarding the accuracy of the machine on the night in question affect the weight of the evidence." *United States v. Foster,* 829 F.Supp.2d at 367. The Court stated that "[w]ithout evidence establishing that this specific Intox EC/IR II had been maintained appropriately and was working properly on the

---

7. *See also United States v. Williams,* 2010 WL 2802457 (E.D.Va.) (Magistrate Judge's decision to admit calibration certificates in evidence in proof of the accuracy of tuning forks used to calibrate radar equipment and the radar equipment used to determine Mr. Williams' speed deemed erroneous because the certificates lacked certification, the custodian of records did not testify and the United States presented no other qualified witness as required under Rule 803(6).); *United States v. Christie,* 2009 WL 4499124 (E.D.Va.) (Certificate of Analysis printout of intoximeter containing the results of Mr. Christie's breath test deemed non-testimonial and therefore not subject to cross examination to the extent that it included verification that the machine was tested for accuracy about 2 1/2 months before Mr. Christie's breath test.); *United States v. Bacas,* 2009 WL 3229370 (E.D.Va.) (Uncertified copies of certificates verifying the accuracy of tuning forks inadmissible because their designated custodian or other qualified witness did not testify at trial.); *United States v. Griffin,* 2009 WL 3064757 (E.D.Va.) (Intoximeter Certificate of Accuracy certifying that routine testing was performed on an EC/IR II was admitted as "nontestimonial evidence beyond the scope and reach of the Confrontation Clause" because it only provided information respecting the calibration and proper operation of the EC/IR II.)

night in question, the court cannot give the .12 BAC reading any significant weight. As such, the court will consider the breath test results ... only to the extent that they establish that Foster had consumed alcohol on April 3, 2011." *United States v. Foster*, 829 F.Supp.2d at 369.

■ In the instant matter, the United States was required to prove that Defendant was operating a motor vehicle in the evening/ morning of September 12/13, 2012, while her BAC was .08 or more in violation of 36 C.F.R. § 4.23(a)(2). Evidence in the form of test results obtained through the use of equipment of proven accuracy and reliability operated by personnel certified in its use was essential. 36 C.F.R. § 4.23(c)(4). It was not disputed that Lieutenant Ragland was certified to operate the EC/IR intoximeter. It was further not disputed that the EC/IR II intoximeter is generally regarded as reliable. Rather, Defendant contended that the United States did not introduce evidence that the EC/IR II used to determine her BAC did so accurately. The Court agrees and finds that the United States introduced no evidence to prove the accuracy of the EC/IR II intoximeter at the time Defendant was tested. The record contains no self-proving attestation or certification of accuracy or analysis as were introduced in the cases mentioned above, and the United States presented no witness to prove otherwise that the test results were accurate. Rather, the United States submitted Log Sheets for the period from August 16 to October 14, 2012, indicating that the EC/IR II used to test Defendant was tested on August 20 and September 26, 2012, and a Monthly Intox EC/IR II Inspection Form dated September 26, 2012. The United States did not introduce a Monthly Intox EC/IR II Inspection Form for the month of August, 2012, prior to Defendant's testing, indicat-

ing what was done in maintaining and testing the machine then. Lieutenant Ragland testified that the machine performed and passed a self-diagnostic system check before he tested Defendant and would have indicated a malfunction on the printout if any had occurred. Lieutenant Ragland indicated that, though certified to operate the machine, he had little knowledge technically and scientifically about the EC/IR II's maintenance and operation. Under quite similar circumstances in *United States v. Foster*, District Judge Urbanski found the test results admissible but gave them little significant weight. The undersigned likewise finds Defendant's test results admissible through the testimony of Lieutenant Ragland but, absent "evidence establishing that this specific Intox EC/IR II had been maintained appropriately and was working properly on the night in question", *United States v. Foster*, 829 F.Supp.2d at 369, will regard them as demonstrating only that Defendant had consumed alcohol during the evening/early morning hours of September 12/13, 2012. The Court cannot determine what Defendant's BAC was then. The Court can therefore not conclude that Defendant was operating a motor vehicle on September 13, 2012, while her BAC was .08 or more in violation of 36 C.F.R. § 4.23(a)(2). Accordingly, the Court finds that Defendant is **NOT GUILTY** of violating 36 C.F.R. § 4.23(a)(2) as charged, and it is hereby **ORDERED** that the charge contained in Violation Notice No. 3173204 is **DISMISSED.**

The Clerk is directed to transmit a copy of this Memorandum Opinion and Order to counsel of record.